# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

```
=============================
                              :
AUCTUS FUND, LLC,             :
                              :
          Plaintiff,          :
                              :
     v.                       :        Civil Action No. _____
                              :
GENEREX BIOTECHNOLOGY CORP.,  :
and NUGENEREX IMMUNO-         :
ONCOLOGY, INC., f/k/a ANTIGEN :
EXPRESS, INC.                 :
                              :
          Defendants.         :
                              :
=============================
```

## PLAINTIFF AUCTUS FUND, LLC'S
## COMPLAINT AND DEMAND FOR JURY TRIAL

## I. INTRODUCTION

1.     The Plaintiff, Auctus Fund, LLC, (hereinafter "Auctus" or the "Fund"), respectfully submits its Complaint and Demand for Jury Trial (hereinafter the "Complaint") against the Defendants, Generex Biotechnology Corporation (hereinafter the "Company" or "GNBT") and NuGenerex Immuno-Oncology, Inc. f/k/a Antigen Express, Inc., a subsidiary of the Company (hereinafter the "Subsidiary" or "NGIO"), in the above-captioned action.  The Plaintiff's allegations, as set out herein, are asserted for injunctive and equitable relief, and for its general, compensatory and consequential damages arising from, and resulting from, the Defendants' violations of the following:

  a)     Section 10(b) of the Securities Exchange Act of 1934, *as amended* (hereinafter the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, as promulgated thereunder, 17 C.F.R. § 240.10b-5;

1

b)    Massachusetts Uniform Securities Act, M.G.L. c. 110A, §§ 101, *et seq.*, *as amended* (hereinafter the "Uniform Securities Act");

c)    "control person" liability, pursuant to Section 15 of the Securities Act of 1933, *as amended,* 15 U.S.C. § 78o (hereinafter the "Securities Act"), and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a);

d)    breaches of contracts;

e)    breaches of implied covenant of good faith and fair dealing;

f)    unjust enrichment;

g)    breaches of fiduciary duty;

h)    fraud and deceit;

i)    negligent misrepresentation; and/or

j)    the Massachusetts Consumer Protection Act, *as amended*, M.G.L. c. 93A, §§ 2 & 11.

2.    The Plaintiff further alleges that, as a result and as caused by the Defendants' securities fraud, breaches, actions, omissions, policies, practices, and/or courses of conduct, Auctus has suffered irreparable harm, requiring injunctive relief and specific performance, harm to its business and reputation in the investment industry, damages from the Defendants' coercion, duress, and unfair and deceptive anti-competitive acts, causing lost revenue, lost profits and prospective business, together with its injuries and damages.

3.    The Plaintiff respectfully requests that its causes of action against the Defendants proceed to a trial by jury, that a judgment be entered on all Counts against the Defendants and that Auctus be awarded its general, compensatory and consequential damages and losses, costs, interest, plus multiple and/or punitive damages, attorneys' fees, and grant, order and enter temporary,

preliminary and permanent injunctive and equitable relief, and grant, order and enter declaratory relief, and any such other relief as this Honorable Court deems just and appropriate.

## II. <u>PARTIES</u>

4.      The Plaintiff, Auctus Fund, LLC is a limited liability company, duly organized in the State of Delaware, with its principal place of business located at 545 Boylston Street, 2nd Floor, Boston, Massachusetts 02116.

5.      Upon information and belief, the Defendant, Generex Biotechnology Corporation, is a Delaware corporation, having its principal place of business and principal executive offices located at  10102 USA Today Way, Miramar, Florida 33025. Defendant GNBT is, and was during the relevant time period, a "control person" of Joseph Moscato, the President and CEO of Defendant Generex Biotechnology Corp. and CEO of Defendant NuGenerex Immuno-Oncology, Inc., and is, and was during the relevant time period, a "control person" of Defendant NGIO within the scope of the federal securities laws.

6.      Upon information and belief, the Defendant, NuGenerex Immuno-Oncology, Inc. f/k/a Antigen Express, Inc., is a corporation, duly organized under the laws of the State of Florida, having its principal place of business and principal executive offices located at 10102 USA Today Way, Miramar, Florida 33025. The Defendant, NuGenerex Immuno-Oncology, Inc. is, and was during the relevant period of time, a subsidiary of Defendant Generex Biotechnology Corporation. On or about March 12, 2020, NuGenerex Immuno-Oncology, Inc. filed a Form 10 with the United States Securities and Exchange Commission (hereinafter "SEC" or "Commission") in order to register its securities as a public company in the over-the-counter securities market (hereinafter "OTC Market").

### III. JURISDICTION AND VENUE

7.       The Plaintiff asserts that this Honorable Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, and pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. §78aa(a).

8.       The Plaintiff contends that, pursuant to 28 U.S.C. § 1391(b), venue is proper in the District of Massachusetts in that, pursuant to the Transaction Documents (as defined below), the Plaintiff Auctus and Defendants GNBT and NGIO agreed that any and all disputes between and/or among them shall be brought, *inter alia*, in the state or federal courts in the Commonwealth of Massachusetts. Additionally, this Court is in such District where the Plaintiff Auctus is headquartered and has its principal place of business and is where the violated conduct described herein is alleged to have occurred.

9.       This Court has personal jurisdiction, generally and specifically, over the Defendants by express terms of the Transaction Documents, and as arising from their extensive business contacts, generally over time and specifically, in their business dealings with Auctus within the Commonwealth of Massachusetts.

### IV. FACTUAL BACKGROUND

#### A.       Auctus Invests in GNBT / NGIO and the Transaction Documents

10.       On or about January 22, 2019, the Company executed, *inter alia*, a certain Securities Purchase Agreement (hereinafter the "First SPA" or the "First Purchase Agreement") and a certain Convertible Promissory Note (hereinafter the "First Convertible Note" or the "First Note" and, with the First Purchase Agreement and certain other documents, collectively hereinafter the "First Transaction Documents"), thereby entering into a contract with Plaintiff Auctus for its investment in GNBT. *See* First Purchase Agreement, as attached, restated and incorporated by reference herein as **Exhibit A**; First Convertible Note, as attached, restated and incorporated by reference herein as

**Exhibit B**. Thereafter, and on various dates, the Plaintiff successfully converted the Company's obligations into publicly traded shares of GNBT common stock and has fully recouped its GNBT investment on the First SPA and the First Note.

11.     On or about August 14, 2019, the Company executed, *inter alia*, a certain Securities Purchase Agreement (hereinafter the "Second SPA" or the "Second Purchase Agreement," and, with the First Purchase Agreement, collectively hereinafter as the "SPA's" or the "Purchase Agreements") and a certain Convertible Promissory Note (hereinafter the "Second Convertible Note" or the "Second Note" and, with the First Note, collectively hereinafter as the "Convertible Notes" or the "Notes"; and, with the Second Purchase Agreement and other documents, collectively hereinafter the "Second Transaction Documents"; and, with the First Transaction Documents, collectively hereinafter as the "Transaction Documents"), thereby entering into further contracts with Plaintiff Auctus for its additional investment in GNBT. *See* Second Purchase Agreement, as attached, restated and incorporated by reference herein as **Exhibit C**; Second Convertible Note, as attached, restated and incorporated by reference herein as **Exhibit D**.

12.     A review of the Transaction Documents reveals that the Notes have a conversion feature into which entitles the Plaintiff to convert, at amounts and upon timing that Auctus deemed appropriate, the Defendants' debt obligations, in whole or in part, into publicly traded shares of GNBT common stock.  Under the terms and conditions of the Transaction Documents, the Plaintiff has, and has had, a contractual right to convert at a price for GNBT common stock, averaged over a series of prior trading days, including and preceding the Conversion Date.

13.     By the Transaction Documents, Defendant GNBT was also required to allocate and reserve shares of its common stock for future conversions by the Plaintiff. The reservation of shares was an independent obligation by the Defendant to the Plaintiff, and was a mechanism by which to effectuate the share conversion as envisioned by the Notes.

14.     In reliance upon the Transaction Documents, during the relevant time period, the Plaintiff issued Notices of Conversions and converted portions of its investment into shares of publicly traded GNBT common stock in OTC Market, and, as a GNBT shareholder and at various times, the Plaintiff has held certain equity positions in GNBT shares in the Defendant Company.

15.     Furthermore, pursuant to Sections 1.2 and 1.6 of each Note, the Plaintiff has the contractual right to receive any and all distributions, stock dividends and/or other similar benefits provided by the Company to shareholders of GNBT.

16.     Thus, in detrimental reliance upon the information, representations and statements from the Defendants, the Plaintiff invested millions of dollars in the Company, which has, and has had, a fiduciary duty and a duty of the utmost loyalty to the Plaintiff.  Unfortunately, to its detriment, the Plaintiff has learned that the Defendant misrepresented and deceived the Fund, and omitted material information while having a duty of disclosure, regarding the Company, its subsidiary, NGIO, and perpetrated securities fraud in connection with the offer, purchase and sale of securities, in violation of, *inter alia*, Section 10(b) of the Exchange Act and Rule 10b-5, as promulgated thereunder, and the Massachusetts Uniform Securities Act, M.G.L. c. 110A, §§101, *et seq., as amended.*

**B.      Defendant's Misrepresentations and Omissions of Material Facts and <u>Securities Fraud in Connection with Offer, Purchase and Sale of Securities</u>**

17.     The Plaintiff asserts and alleges that the Defendant GNBT misrepresented, omitted and failed to provide material facts to Auctus in connection with its investments and in the offer, purchase and sale of securities, and especially with respect to the business, finances, operations and other material matters relating to the Defendants, including but not limited to certain corporate transactions of Defendant GNBT.

1)      **Defendant GNBT's Misrepresentations and Omissions of Material Facts**

18.     Solely as an example of such material misrepresentations, omissions and/or misleading or false information, on or about July 25, 2019, the Defendant published and disseminated certain statements, entitled, "*Generex Biotechnology Provides a Summary of Its Investor Conference Call Held on July 25, 2019,*" which provided, in pertinent part, as follows:

Press Release | 07/26/2019

- Filing up-list application to Nasdaq
- Details on 1:1 Shareholder stock dividend
- Spin-out of NuGenerex Immuno-Oncology as a separately-traded public company
- Merger of NGIO with Kiromic
- Payoff of notes
- Recording available at www.generex.com

MIRAMAR, Fla., July 26, 2019 (GLOBE NEWSWIRE) -- Generex Biotechnology Corporation (www.generex.com) (OTCQB:GNBT) today provided a summary of the investor conference call held yesterday, July 25, 2019 at 4:00 pm during which Joseph Moscato, Generex President & Chief Executive Officer updated investors on the company's plans for the GNBT up-list and the previously declared 1:1 share dividend. He also provided guidance on the proposed timing for the NuGenerex Immuno-Oncology (NGIO) spinout and subsequent planned merger with Kiromic.

Mr. Moscato stated: "Many thanks to our shareholders and interested parties for calling in yesterday to hear about our progress in achieving stage 3 of our plan to bring Generex back to the Nasdaq. For those who could not join the call, I am providing this summary. The full recording of the call is now available on our corporate web site, and the transcript will be available early next week."

"First, I am happy to report that Generex has paid the Nasdaq up-list application fee, and we expect the review process to take 30 to 60 days. As announced, we have worked with Donahoe Associates on our up-list application, and we will keep our shareholders apprised of our progress. Following a successful up-list of GNBT to the Nasdaq national market, the 1:1 share dividend will be paid the following day, with the ex-date two days following payment of the dividend. Note that the record date for the dividend was July 24, 2019, so anyone who held shares on that date is eligible for the dividend. If anyone sells shares between the record date and the ex-date, the purchaser of the shares is entitled to the dividend. The Company will provide further guidance on the treatment of the dividend shares through a future press release."

"As a reminder, Generex renamed its wholly-owned cancer subsidiary Antigen Express as NuGenerex Immuno-Oncology (NGIO), which we plan to build into a multi-platform cancer immunotherapy company. Generex has identified a public company into which

we plan to merge NGIO and launch a new research effort to expand the oncology indications and applications for AE37 to complement our research partnership agreement with Merck to study the combination of AE37 in combination with Merck's checkpoint inhibitor, Ketruda® (pembrolizumab) for the treatment of triple negative breast cancer; the trial is currently screening patients for enrollment. Additionally, NGIO is working with our licensing partner Shenzhen Bioscien, a Chinese biopharmaceutical company, to develop AE37 for the treatment of prostate cancer. Under terms of the agreement, Shenzhen is to pay for the commercial development of AE37, conducting clinical trials in the EU and in China under ICH guidelines. Shenzhen holds the exclusive license for the use of AE37 for the treatment of prostate cancer only in China; Generex retains rights to the clinical data as well as global market rights for AE37 in the prostate cancer market outside of China."

"On February 25, 2019 Generex paid a dividend in our new cancer company, whereby Generex shareholders received 1 share of NGIO for every 4 shares of GNBT. Those shares are now book-shared with Generex's transfer agent, which is holding them in GNBT shareholders accounts; the shares will have value once we take NGIO public. The Company is working with the auditors and legal to coordinate the documentation, applications, and regulatory filings necessary for the spin-out. We are planning to execute the NGIO spin-out in the next 60 to 90 days and we will inform shareholders as we proceed through the process."

Once the spin-out is accomplished, we plan to finalize a merger agreement with Kiromic, a clinical-stage immuno-oncology company with multiple, patented proprietary platforms, including CAR-T, CAR NK, an oral vaccine delivery system, and DIAMOND AI, an artificial intelligence system with a multifaceted predictive algorithm. Kiromic was granted the last orphan indication for ovarian cancer by FDA. In addition to advancing the ovarian cancer program, NGIO plans to advance Kiromic's proprietary CAR-T and CAR NK technologies into proof of concept clinical trials."

"Finally, I am happy to announce that we have paid off two note holders and will pay off the third noteholder early next week to clean up the balance sheet and add further value that will be a benefit for our up-list application to Nasdaq."

In closing, Generex is nearing the final steps in our three-stage plan to return the Company to Nasdaq, and we are proud to have returned value to our loyal shareholders. We plan to continue executing our plan to build a new Generex that provides end to end solutions for physicians and patients. As always, if shareholders have questions or comments, please feel free to contact me.

19.     Upon information and belief, the Defendant's statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff. As further specificity as to the false, and misleading statement, the Defendant's CEO, Joseph Moscato, publicly asserted that "Generex shareholders received 1 share of NGIO for every 4

8

shares of GNBT," which statement was false, misleading and omitted material information, which the reasonable investor would deem important to its investment, while having a duty to disclose the same to, *inter alia*, the Plaintiff, which relied upon the same, to its detriment.

20.     Upon information and belief, the Defendant's statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff. As further specificity as to the false, and misleading statement, the Defendant's CEO, Joseph Moscato, publicly asserted that "[t]hose [NGIO] shares are now book-shared with Generex's transfer agent, which is holding them in GNBT shareholders accounts; the shares will have value once we take NGIO public," which statement was false, misleading and omitted material information, which the reasonable investor would deem important to its investment, while having a duty to disclose the same to, *inter alia*, the Plaintiff, which relied upon the same, to its detriment.

21.     Upon information and belief, the Defendant's statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff. As further specificity as to the false, and misleading statement, the Defendant's CEO, Joseph Moscato, publicly asserted that "We are planning to execute the NGIO spin-out in the next 60 to 90 days [from July 25, 2019]," which statement was false, misleading and omitted material information, which the reasonable investor would deem important to its investment, while having a duty to disclose the same to, *inter alia*, the Plaintiff, which relied upon the same, to its detriment.

22.     Upon information and belief, Defendant NGIO failed to file its Form 10 to register its securities with the SEC until on or about March 12, 2020. *See* NuGenerex Immuno-Oncology (NGIO) Form 10, dated March 12, 2020, as filed with the Commission, by attached, restated and incorporated by reference herein as **Exhibit E.**

23.     As a further example of such material misrepresentations, omissions and/or misleading or false information, on or about August 19, 2019, the Defendant published and

disseminated certain statements, entitled "*Generex Announces Acquisition of Additional 38% of Subsidiary Olaregen Therapeutix in an Up-Market Transaction with a Share Exchange of GNBT Stock at $2.50*," which provided, in pertinent part, as follows:

Press Release | 08/19/2019

Generex Now Owns 99% of Subsidiary Olaregen Therapeutix Generex Satisfies Notes for $138,000 and $900,000 to clear debt NuGenerex Immuno-Oncology Spin-out Evaluating Acquisition of a Hospital Network Completed Audit of Direct-to-Patient Pharmacy Business MIRAMAR, Fla., Aug. 19, 2019 (GLOBE NEWSWIRE) -- Generex Biotechnology Corporation (www.generex.com) (OTCQB:GNBT) ("Generex") is pleased to announce that Generex has acquired an additional 38% of Olaregen Therapeutix for a total Generex ownership of approximately 99% after the share exchange at $2.50 a share for GNBT stock, in a cashless transaction. An 8-K will be filed with the SEC outlining the details of the transaction. Also, Generex is pleased that today it paid the final payment of $138,000 to a noteholder to satisfy an outstanding note, which together with the payment of $900,000 on Friday August 16, clears over $1 million in debt from the books to further strengthen the Generex balance sheet as the Nasdaq up-list application is being processed.

Joseph Moscato, Generex President & Chief Executive Officer stated, "We are thrilled to acquire an additional 38% of Olaregen as we launch ExcellagenÒ into the marketplace. Today's buyout of the Olaregen shareholders was unexpected and we are very happy that those shareholders believe enough in the Generex strategy that they exchanged their private shares for Generex public shares further demonstrating to us and our shareholders the value we are creating. We have had great feedback from the medical community about the use of Excellagen for the management of diabetic foot ulcers and other hard to heal wounds as evidenced by the recently awarded Seal of Approval from the American Podiatric Medical Association (APMA). Additionally, we are gaining acceptance in the Veterans Health Administration (VA) system as well as in major medical research institutions. Generex now owns close to 100% of this FDA cleared and approved treatment paradigm, additionally adding substantial shareholder value. This acquisition also demonstrates the true partnership approach that we take with our subsidiary companies, which have great, independent operating teams that work together to realize synergies across the NuGenerex family of companies. Our partners believe in our transformative model, and we are excited to accelerate the sales of Excellagen and the pipeline of Olaregen products that will be launching in the next several weeks and months."

Mr. Moscato continued, "In addition to the exciting news about Olaregen, this morning we paid the final cash payment of $138,000 dollars to another note holder on top of the $900,000 final payment in cash Friday to another note holder, thereby closing those notes out completely, further enhancing our balance sheet as we make our move to the Nasdaq stock exchange."

"Also, we are preparing the legal merger documents for NuGenerex Immuno-Oncology (NGIO) for the merger into a public entity. We are excited about this initiative, as the NGIO spin-out will enable us to recapture the value of our immuno-oncology assets, including the AE37 immunotherapeutic vaccine and the Ii-Key immune activation technology. We are also building additional value for shareholders with the acquisition of Kiromic Inc. and their clinical stage immunotherapy program, which has received the final orphan indication in ovarian cancer from the FDA. Moreover, Kiromic's oral vaccine technology and the DIAMOND AI artificial intelligence algorithm for identification of neo-antigens will advance the treatment of cancer with personalized immunotherapy regimens. We believe the spin-out of NGIO and subsequent acquisitions will add hundreds of millions in assets and value to further enhance the Generex balance sheet."

"Finally, I would like to provide our shareholders with an update on the hospital network and pharmacy business that we have been evaluating over the last several months. We are doing the necessary work to evaluate the potential of acquiring up to 13 hospitals, which includes rural hospitals designated as federal Critical Access Hospitals (CAHs) that provide payments and incentives under CMS. We are also very active with negotiations to acquire the direct-to-patient pharmacy business that we have audited over the last year. Now that we have completed the audit, we plan to move forward with this acquisition once we are Nasdaq listed. These acquisitions will complement our new partnerships with endocrinology clinics in Arizona where we are creating an MSO/HMO model with integrated specialty services for complex diabetes patients, including ophthalmology and podiatry services. Plus, we plan to provide patient focused services and cutting edge products through our physician networks to provide clinical and economic benefits for doctors and patients. Our end-to-end service model will drastically change the way patient centric treatment and coordinated care is administered locally as we build the NuGenerex model nationwide!"

24.    Upon information and belief, the Defendant's statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff. As further specificity as to the false, and misleading statement, the Defendant publicly asserted that "[a]lso, we are preparing the legal merger documents for NuGenerex Immuno-Oncology (NGIO) for the merger into a public entity. We are excited about this initiative, as the NGIO spin-out will enable us to recapture the value of our immuno-oncology assets," which statement was false, misleading and omitted material information, which the reasonable investor would deem important to its investment, while having a duty to disclose the same to, *inter alia*, the Plaintiff, which relied upon the same, to its detriment.

25.     Upon information and belief, Defendant NGIO failed to file its Form 10 to register its

securities with the SEC until on or about March 12, 2020. *See* NGIO Form 10 (**Exhibit E**).

26.     As a further example of such material misrepresentations, omissions and/or

misleading or false information, on or about September 3, 2019, the Defendant published and

disseminated certain statements, specifically announcing a stock dividend and issued a press release,

entitled "*Generex Biotechnology Confirms Record Date for 1:1 Dividend*," and stated, in pertinent

part, as follows:

> Press Release | 09/03/2019
>
> - Record date of August 30, 2019 confirmed
> - Shareholders must hold shares through October 30, 2019 to receive dividend
> - Dividend Waived by insiders, note holders, acquisitions, and pool shares
> - Pool shares being retired on October 30, 2019
>
> MIRAMAR, Fla., Sept. 03, 2019 (GLOBE NEWSWIRE) -- Generex Biotechnology Corporation (OTCQB:GNBT) today confirmed that the record date for the 1:1 (100%) stock dividend was recorded on August 30, 2019, and the dividend will be paid on October 29th  to all shareholders who hold their shares through the ex-date of October 30, 2019. Anyone who sells their shares before the market close on October 30th will lose the dividend, which will be transferred to the buyer of your shares, just as anyone buying shares from now through October 30th will receive the 1:1 (100%) dividend from the seller of the shares.
>
> Management and company insiders, note holders, acquisition partners, and the pool shares controlled by Generex President & CEO Joe Moscato on behalf of the Pool owners have waived their rights to the dividend. Therefore, if any of these entities or persons sells their shares, they will receive a "Pay Due Bill" and personally owe the dividend shares to the buyer, which is their sole responsibility to pay; Generex will not pay the dividend for for those who have waived the dividend.
>
> Mr. Moscato stated, "It is official, and congratulations to all current shareholders and any new shareholders who purchase GNBT stock through October 30, 2019. This dividend and our Nasdaq up-listing, which is currently in review, highlight the end of our 3-phase plan put forth to shareholders in January 2017 to transform GNBT into an integrated life science and healthcare company with a focus on end to end solutions for physicians and patients who battle chronic, costly, and debilitating diseases like arthritis, diabetes, and cancer. Additionally, on the pay date, I will be retiring the nearly 21 million pool shares to significantly limit the dilution effect of the dividend on shareholders. These events are the catalysts in furthering our acquisition strategy,

and we have a number of new announcements slated over the coming weeks that will further our mission! It is exciting times for Generex and our shareholders, and we look forward to continued growth and execution for our long-term plans….”

27.    Upon information and belief, the Defendant's statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff. Upon information and belief and as subsequent events demonstrated, Defendant GNBT awarded and delivered dividend shares to its investors on an arbitrary and capricious manner, in accordance with the whims and decisions of its CEO, Joseph Moscato, which caused such statements to be false, misleading and omitted material information, which the reasonable investor would deem important to its investment, while having a duty to disclose the same to, *inter alia*, the Plaintiff, which relied upon the same, to its detriment.

28.    As a further example of such material misrepresentations, omissions and/or misleading or false information, on or about December 5, 2019, the Defendant published and disseminated certain statements, specifically announcing a stock dividend and issued a press release, entitled "*Generex Biotechnology Announces Funding Update*," and stated, in pertinent part, as follows:

Press Release | 12/05/2019

MIRAMAR, Fla., Dec. 05, 2019 (GLOBE NEWSWIRE) -- Generex Biotechnology Corporation (OTCQB: GNBT) is pleased to announce that the company has finalized agreements to provide significant funding for ongoing operations, launching new businesses, and advancing the commercial development of new products from the NuGenerex family of companies. As discussed on the shareholder conference call last Friday, Generex yesterday signed definitive documents to secure a short-term bridge financing of $2.2 million dollars.  Generex also signed documents for 40 million in an equity investment instrument that will close once the company has an effective registration statement covering the shares issued under that instrument. With these funding initiatives complete and definitive, Generex plans to move forward immediately to establish our Arizona operations for diabetes and chronic care management, including our podiatry, ophthalmology, neurology, and pharmacy practices in partnership with the Arizona Endocrinology Center and Paradise Valley Family Practice. The funds will be used to build out facilities, hire the medical and clinical staff, and to secure the licenses and accreditation for our MSO/HMO network

that will make our vision a reality.  Additionally, the funds will be used to complete the acquisition of Altucell and to fund human clinical trials of Altsulin® encapsulated Sertoli cells for Type I diabetes and encapsulated stem cells in Altucaps® for autoimmune and inflammatory disorders. The funds will also support the ongoing clinical development efforts with AE37 in combination with Merck's Keytruda for the treatment of triple negative breast cancer, as well as clinical trials of Regentys ECMH for the treatment of ulcerative colitis, which are expected to begin shortly. In addition, the funds will allow us to also expand the product portfolios of our subsidiary companies, Medisource, Pantheon, and Olaregen, particularly in the regenerative medicine space, where we will be announcing new product introductions in the coming weeks.  Finally, the funding will allow Generex to re-start the MSO with a new, fully compliant operating structure that will enable us to execute our strategy to provide an end-to-end patient-focused solution our partners, the orthopedic surgeons and podiatrists in the MSO. Also, in the coming days, Generex will file 8K's on these investments, and will provide guidance on the next steps for reinstating the postponed dividend.

Joe Moscato, President & CEO of Generex stated, "These equity investments are key to building out many of our new businesses and solidifying our subsidiary partnerships to further the clinical development and commercialization of a wide array of new products.  After much work, Generex is excited to receive funding for our enterprise that will enable us to realize real revenues and further the science that forms the foundation for our valuable assets to build considerable value into the future. Further, this funding is expected to cover our one-year plus operational costs, allowing the removal of the going concern by our auditors. and enabling us to once again move toward a Nasdaq listing, building value to bring our share price back to a qualifying level for the up-list. With these investments in hand that will fund Generex over the next 2 to 3 years, we are excited for 2020 and beyond."

29.    Upon information and belief, the Defendants' statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff. As further specificity as to the false, and misleading statement, the Defendant publicly asserted that

"this funding is expected to cover our one-year plus operational costs, allowing the removal of the going concern by our auditors, and enabling us to once again move toward a Nasdaq listing, building value to bring our share price back to a qualifying level for the up-list. With these investments in hand that will fund Generex over the next 2 to 3 years, we are excited for 2020 and beyond."

30.    The Plaintiff contends that such statements by the Defendant were false, misleading and omitted material information, which the reasonable investor would deem important to its

investment, while having a duty to disclose the same to, *inter alia*, the Plaintiff, which relied upon the same, to its detriment.  Indeed, a mere five (5) months later and in direct contravention of such representations, Defendant GNBT has asserted, in an action in the Texas state courts, that it is faced with a "death spiral," requiring a breach of the Transaction Documents with the Plaintiff, and would otherwise anticipate that it would have to cease business operations in the immediate future.

31.     As a further example of such material misrepresentations, omissions and/or misleading or false information, on or about January 10, 2020, Defendant GNBT published and disseminated certain statements, specifically announcing a stock dividend and issued a press release, entitled "*Generex Biotechnology Announces Update to Shareholder Stock Dividend*," and stated, in pertinent part, as follows:

> Press Release | 01/10/2020
>
> - FINRA Process Not Complete
> - New Pay Date to be announced
>   - Record Date will remain August 30, 2019
> - Dividends will remain the same
>   - Shareholders to receive 2 to 5 stock dividend of Generex Biotechnology shares plus an additional 2 to 5 stock dividend of NuGenerex Immuno-Oncology shares
>
> MIRAMAR, Fla., Jan. 10, 2020 (GLOBE NEWSWIRE) -- Generex Biotechnology Corporation (www.generex.com) (OTCQB:GNBT) ("Generex") today announced that the pay day for the two previously announced dividends in Generex Biotechnology and in NuGenerex Immuno-Oncology have been postponed due to  FINRA's continuing review and approval process.  Since our last announcement, FINRA requested additional information, which Generex has supplied, but FINRA has not yet completed processing of this information.  We are delaying announcing a new payment date and ex-dividend date until we have a firm estimated of the FINRA approval date, which we believe we will have sometime next week.  Although unfortunate, the delay is temporary and Generex is committed to delivering the dividends to shareholders as soon as the approvals are obtained. Please remember if you sell your shares before the ex-date you will get a pay due bill and your dividend shares will go to the buyer. Conversely, if you buy shares up through the ex-date, you will receive the dividend through the "Pay Due" system and the seller will automatically pay you the dividends through broker to broker transfer.
>
> Joe Moscato, President & CEO of Generex said, "We are working closely with FINRA to answer any and all questions they have about the dividends, and we will provide an

update on timing just as soon as possible." Mr. Moscato continued, "Personally, I cannot wait to finally pay this dividend that shareholders deserve for believing in our plans that we started 3 years ago on January 17, 2017. Once the dividend is paid, we can concentrate on building the enterprise value of the acquisitions we have made in the orthopedic and wound care space, launching our end-to-end solution for diabetes care in Arizona, bringing NuGenerex Immuno-Oncology public, and closing the ALTuCELL deal to initiate the clinical development of their cutting-edge cell therapy for Type I diabetes. Again, thanks for your patience and we are looking towards positive results for Generex and our NuGenerex family of subsidiary companies in 2020."

32.     Upon information and belief, the Defendant's statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff. Upon information and belief and as subsequent events demonstrated, Defendant GNBT published, disseminated and distributed multiple public statements between in or about October 2019 and in or about January 2020 relating to "updates" as to the delivery of dividends, which were false, misleading and omitted material information, which the reasonable investor would deem important to its investment, while having a duty to disclose the same to, *inter alia*, the Plaintiff, which relied upon the same, to its detriment.

33.     Upon further information and belief, the Defendant's statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff. Upon information and belief and as subsequent events demonstrated, Defendant GNBT awarded and delivered dividend shares to its investors on an arbitrary and capricious manner, in accordance with the whims and decisions of its CEO, Joseph Moscato, which caused such statements to be false, misleading and omitted material information, which the reasonable investor would deem important to its investment, while having a duty to disclose the same to, *inter alia*, the Plaintiff, which relied upon the same, to its detriment.

34.     As a further example of such material misrepresentations, omissions and/or misleading or false information, on or about January 16, 2020, the Defendants published and disseminated certain statements, specifically announcing a stock dividend and issued a press release,

entitled "*Generex Biotechnology Provides 2019 Year-End Summary & 2020 Plans*," and stated, in pertinent part, as follows:

> Press Release | 01/16/2020
>
> MIRAMAR, Fla., Jan. 16, 2020 (GLOBE NEWSWIRE) -- Generex Biotechnology Corporation(www.generex.com)(OTCQB:GNBT)(http://www.otcmarkets.com/stock/GNBT/quote) is happy to provide the investment community with a review of the many challenges overcome and accomplishments achieved in 2019, with a vision for revenue and growth in 2020 by Generex President & CEO Joseph Moscato.
>
> Dear Generex Shareholders,
>
> Since the new management team was put in place 3 years ago in January 2017, we have transformed Generex Biotechnology into an integrated healthcare holding company with end-to-end solutions for patient centric care from rapid diagnosis through delivery of personalized therapies. The NuGenerex family of subsidiary companies offers a broad range of products and services to meet the needs of physicians and patients.
>
> Generex is building a new kind of healthcare company that extends beyond traditional models providing support to physicians in a management services organization (MSO) network, and ongoing relationships with patients to improve the patient experience and access to optimal care.
>
> We started out the year focused on accelerating the geographic growth of our highly valuable MSO and planned the launch of a new software and service offering, DME-IQ that orthopedic practices can use to manage DME inventory and payments from both insurers and patients. After significant due diligence we determined that there were distressed assets which we could acquire at a significant discount and reconfigure into a novel, public company MSO model aligning our shareholders and MSO ownership. We are behind on the plan, however, because months after we closed the deal, federal authorities alerted us to "undisclosed and unknown" compliance issues involving the sellers in years way prior to our purchase, which affected our ability to move forward rapidly. We complied with the government's requests, terminating personnel they identified as bad actors and immediately reconstructed our MSO in a public company structure ready and desired in the marketplace. All legal remedies against the sellers are under way. Meanwhile, as soon as funding is in place, we will launch our public platform MSO. We have received positive feedback from potential partner practices that indicated that they will sign up faster under our novel, public company structure than for any private company offering, so we are confident of a significant success with our plan. Our goal is to generate significant revenues and profits as we fund the enterprise to restart operations and expand the model nationally.

To advance our end-to-end strategy for our MSO, Generex identified several acquisition targets that provide products and services to the MSO physicians. The first acquisition completed in 2019 was Olaregen Therapeutix, manufacturer of Excellagen® wound conforming gel matrix, a Cellular Tissue Product (C/TP) that is cleared by FDA for the management of 17 types of wounds, including diabetic foot ulcers and venous leg ulcers. In mid-year, the Olaregen team, headed by CEO Anthony J. Dolisi launched Excellagen in the VA system where we are seeing excellent early clinical results, and we are beginning to achieve uptake by VA hospitals across the country.

Excellagen sales are expected to accelerate in 2020 as the VA adopts the use of the product throughout the system. Additionally, Olaregen is preparing to launch a product line extension with Excellagen Aesthetic, which is positioned in the aesthetic dermatology market for the management of skin lesions following chemical peel, laser treatment, or micro-needling procedures that are used widely in the skin rejuvenation field. Further, Olaregen is launching new products in the wound care space including our patent pending Olarex umbilical cord tissue.

At the start of the year, we also began evaluating select companies in orthopedic implant and the surgical supply space that could provide an array of implants, surgical kits and supplies, and particularly biologics to our MSO physician practice partners. We evaluated several organizations that wished to become part of the NuGenerex family of integrated companies and our end-to-end model for healthcare. After a rigorous due diligence process, through which several companies were eliminated from consideration, we acquired 100% interest in Pantheon Medical, a manufacturer of orthopedic implants and foot & ankle surgical kits, and MediSource Partners, a national distributor of orthopedic implants and surgical kits & tools, with a catalogue of biologics and tissue products that fit perfectly with our new business model. These acquisitions were finalized in August of 2019, and today are performing above expectations, with significant growth in revenue from the current customer base and substantial upside potential as we expand distribution nationally in 2020.

In September 2019, we signed letters of intent with Arizona Endocrinology Center and Paradise Valley Family Medicine to establish NuGenerex Health, LLC to establish a new MSO focused on the delivery and management of healthcare services for patients with chronic, complex medical conditions, particularly diabetes. Together, the two medical practices currently work in concert to provide primary care and specialty endocrinology healthcare services for a patient population of roughly 65,000 patients, 25,000 of whom are insulin-dependent diabetes patients. Under the terms of the agreements, Generex Biotechnology will establish NuGenerex Health, LLC as a multispecialty health services provider that provides ancillary specialty healthcare services and disease management solutions for patients living with diabetes. NuGenerex Health is designed as an MSO partnership with the medical groups to offer ophthalmology, podiatry, neurology and ancillary health services that will provide patients with integrated, concierge care to improve outcomes and reduce costs. By bringing specialty ancillary care directly to the patients who regularly visit the practices, NuGenerex Health provides an integrated, collaborative care model not

18

only to enhance patient wellbeing, but also to comply with CMS guidelines for diabetes and chronic care management that can lead to 5-star ratings and increased reimbursements. In addition, we are establishing the Diabetes Research Center of Excellence to advance the clinical development of not only our own diabetes products, but also new cutting-edge therapies, particularly in the cell therapy and regenerative medicine space. We plan to initiate operations for NuGenerex Health in the first quarter of this year, with the ultimate goal of building an HMO to service Medicare Advantage plans.

One of the most exciting things that happened this year was my introduction to Gary Harlem and his company ALTuCELL last summer. I learned that Gary, the Founder & CEO of ALTuCELL has a son with Type I diabetes, and that after divesting his highly successful vitamin and supplement company, went on a global search for a cure. When he found Dr. Ricard Califiore and his research team at the University of Perugia in Italy ten years ago, Gary found his life's focus, providing financial support for the development of advanced cell encapsulation technology aimed at the cure of diabetes through cellular therapy. He formed ALTuCELL and patented the chemistry, engineering, purification, and utility of the capsules on a global basis, and he continues protecting the technology through an ongoing, global patent strategy. Following payment of the upcoming dividend, we plan to close the acquisition and work with the ALTuCELL team to initiate clinical trials for Types I & Type II diabetes through our Diabetes Research Center. Additionally, we will be identifying partnership opportunities with cellular and gene therapy companies to which we plan to license the patented AltuCaps technology for the treatment of autoimmune and inflammatory diseases.

In 2019, we also made significant progress in revitalizing our oncology franchise. Generex has a long, 15-year history of developing immunotherapeutic products including our lead immunotherapeutic product AE37, a HER2/neu peptide linked to Ii-Key that has shown activity in breast cancer. The value of our technology, however, has been locked in NuGenerex Immuno-Oncology (formerly Antigen Express) under the Generex subsidiary structure. In 2018, we announced plans to spin out NuGenerex Immuno-Oncology (NGIO) as a separate public company, and in 2019 we explored a number of options, including the evaluation of several acquisition targets and potential merger partners. At the end of the year, we made the decision to bring NGIO directly to the public markets in order to unleash the inherent value of our immune system activating Ii-Key technology that activates T-cells against cancer antigens. Our technology platform has been rejuvenated by the huge market success of the PD-1, PDL-1, and CTLA 4/6 immune checkpoint inhibitors, six of which have been approved by FDA in the last couple of years. This was demonstrated by our success this past year in resurrecting the clinical development of AE37 in breast cancer, and we are currently conducting a phase II clinical trial of AE37 in combination with pembrolizumab (Merck's Keytruda®) for the treatment of triple-negative breast cancer. The first cohort of patients has completed the initial safety evaluation for AE37/Keytruda combination therapy, and we are looking forward to completing the patient enrollment this year.

In addition to the Merck research agreement, we have a licensing and development agreement with Shenzhen Bioscien, a Chinese biopharmaceutical company for the use of AE37 in the treatment of prostate cancer in China. Our partners at Shenzhen are working with the Chinese regulatory authorities to obtain approval for conducting trials in China, which includes fulfilling manufacturing and pre-clinical requirements. As per our licensing agreement, Shenzhen is planning a global trial in China and in Europe using one of our clinical research sites that have previous experience conducting clinical trials with AE37. We look forward to seeing further progress with the prostate cancer clinical program in 2020.

We expect to achieve the public spin-out of NGIO in the first quarter of calendar 2020. Following funding of the newly-public NGIO, we have plans to conduct a Phase II clinical trial of AE37 in combination with checkpoint inhibitor therapy for the treatment of bladder/urothelial cancer and another Phase II trial using the Ii-Key peptides GP-100 and TYR in combination with checkpoint inhibitors for the treatment of melanoma. Both of these trials are being planned with two leading oncology research institutions, and additional announcements will be forthcoming regarding these clinical collaborations.

In parallel with the reorganization of our corporate assets and operations, we made a concerted effort to fix our balance sheet in 2019. I am happy to report that we were successful in building shareholder value by converting a shareholder liability of negative $43 million to a positive shareholder's equity of $7.7 million, as stated in our 10-K. We plan to continue our progress in building shareholder value in 2020 when we spin out NuGenerex Immuno-Oncology (NGIO) as a separate public company in the hot field of immunotherapy for cancer. Once NGIO is a separate, public company, Generex will continue to own the majority share of a highly valuable oncology company, and this value will be reflected in our balance sheet.

We are determined to correct and turn into a positive overall outcome for Generex shareholders recent problems that have caused a decline in our share price since September resulting from illegal trading by two groups: Creek Mountain Fund from whom we acquired 20% of Olaregen in exchange for 4 million shares of Generex stock, and Veneto Holdings who owned 8.4 million restricted shares of Generex stock despite never transferring the associated Veneto assets to Generex. Last September, these groups started selling all of their shares to create major downside pressure on the stock price. In the case of Creek Mountain, the Fund signed an agreement to waive the upcoming dividend and to hold their 4 million shares in book entry until after the dividend was paid. Unbeknownst to Generex, and in violation of our written agreement, Creek Mountain took their shares out of book entry and sold them without filing the requisite regulatory documentation with the regulatory authorities, delaying our planned dividend to shareholders.

In the case of Veneto Holdings, they received restricted shares of Generex with a restrictive legend. Since the assets underlying the deal were never transferred by Veneto Holdings to Generex, they were not entitled to have the legend removed from the restricted shares which are in dispute. Unfortunately, the transfer agent, without

Generex' consent, transferred 8.4 million shares to Veneto Holdings and removed the restricted legend. The transfer agent acted despite numerous warnings from Generex management and legal counsel, as well as the filing of an 8-K attesting to the fact that the Veneto assets were never delivered. Following this egregious action by the transfer agent, the Veneto partners proceeded to dump their now unrestricted shares into the market without filing a Form 144, which must be filed with the SEC by an affiliate of the issuer as a notice of the proposed sale of securities.

Since Creek Mountain Fund and Veneto Holdings started illegally selling shares and putting downside pressure on the stock, our price per share has plunged 75%. We hold these groups as well as the transfer agent liable and responsible for this illegal activity, Their actions were taken without regard to Generex, our shareholders, or financial regulations, and we are pursuing all civil and criminal remedies to rectify this matter, including legal actions to recoup financial losses and filing complaints with regulatory agencies that oversee publicly traded companies. Our attorneys have contacted the SEC in regard to these matters, and we expect a favorable outcome. We will keep our shareholders apprised of our activities and actions in regard to this ongoing matter, as we believe that eventually justice will be done to the benefit of Generex and our shareholders.

In conclusion, this week marks the three-year anniversary from the start of a transformation and revitalization of Generex for our loyal shareholders. We are positioned to realize our vision of building a new kind of healthcare company that is dedicated to rebuilding the patient/physician relationship by providing end-to-end solutions that restructure healthcare economics and optimize health outcomes for the benefit of doctors and their patients. We have filed the Generex S-1 registration statement with the SEC, we expect to pay our shareholder dividends shortly, the NGIO public spin-out is in progress, and we are restarting our orthopedic MSO and planning to start our Arizona operations. And perhaps most exciting, we will be closing our ALTuCELL deal shortly, and we will be revealing exciting news about the potential to cure Type I diabetes with cell therapy. Our plans for revenue revitalization and growth are in place, and we look forward to making 2020 the year that Generex is back on top.

I will discuss our year in review and provide additional details about our 2020 plans on our shareholders call next Tuesday January 21 at 9:30 AM; details for the call will follow.

35.     Upon information and belief, the Defendants' statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff. As further specificity as to the false, and misleading statement, the Defendant publicly asserted that,

"We have filed the Generex S-1 registration statement with the SEC, we expect to pay our shareholder dividends shortly, the NGIO public spin-out is in progress, and … Our plans for revenue revitalization and growth are in place, and we look forward to making 2020 the year that Generex is back on top."

36.     Upon information and belief and as subsequent events demonstrated, Defendant GNBT awarded and delivered dividend shares to its investors on an arbitrary and capricious manner, in accordance with the whims and decisions of its CEO, Joseph Moscato, which caused such statements to be false, misleading and omitted material information, which the reasonable investor would deem important to its investment, while having a duty to disclose the same to, *inter alia*, the Plaintiff, which relied upon the same, to its detriment.

37.     As a further example of such material misrepresentations, omissions and/or misleading or false information, on or about February 6, 2020, the Defendant published and disseminated certain statements, specifically announcing a stock dividend and issued a press release, entitled "*Generex Provides Stock Dividend Updates and Guidance*," and stated, in pertinent part, as follows:

> Press Release | 02/06/2020
>
> - Awaiting completion of FINRA approval process
> - Dividends remain the same
>   - Shareholders to receive 2 to 5 stock dividend of Generex Biotechnology shares plus an additional 2 to 5 stock dividend of NuGenerex Immuno-Oncology shares
>
> MIRAMAR, Fla., Feb. 06, 2020 (GLOBE NEWSWIRE) -- Generex Biotechnology Corporation (www.generex.com) (OTCQB:GNBT) ("Generex") today announced an update on the pending 2:5 stock dividends in Generex and NuGenerex Immuno-Oncology. Generex originally submitted the dividend request for a corporate action to FINRA and paid the applicable fees in November 2019. Since then, the company has responded to FINRA's requests for further information many times, and we continue in our efforts to work diligently and cooperatively with FINRA to process the dividend. Please note that the company has no control of the FINRA approval process, which is out of Generex' hands as to timing of any decisions.
>
> Joe Moscato, President & CEO of Generex, said, "We regret the delay in processing the dividend and remain fully committed to paying this valuable dividend to our

shareholders. I would like to thank all of you for your patience in this process. We realize this delay has eroded share value, however, based on the exhaustive review by FINRA, we believe that their approval will be given soon, at which time we will certainly inform shareholders immediately. Generex would like to thank our shareholders for standing behind us, as we continue to work in your interests with a commitment to paying these dividends as soon as possible."

38.     Upon information and belief, the Defendant's statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff. As further specificity as to the false, and misleading statement, the Defendant publicly asserted that, it was providing an,

"… update on the pending 2:5 stock dividends in Generex and NuGenerex Immuno-Oncology….

Joe Moscato, President & CEO of Generex, said, "We regret the delay in processing the dividend and remain fully committed to paying this valuable dividend to our shareholders…. Generex would like to thank our shareholders for standing behind us, as we continue to work in your interests with a commitment to paying these dividends as soon as possible"

39.     Upon information and belief and as subsequent events demonstrated, Defendant GNBT awarded and delivered dividend shares to its investors on an arbitrary and capricious manner, in accordance with the whims and decisions of its CEO, Joseph Moscato, which caused such statements to be false, misleading and omitted material information, which the reasonable investor would deem important to its investment, while having a duty to disclose the same to, *inter alia*, the Plaintiff, which relied upon the same, to its detriment.

40.     As a further example of such material misrepresentations, omissions and/or misleading or false information, on or about February 24, 2020, the Defendants published and disseminated certain statements, specifically announcing a stock dividend and issued a press release, entitled "*Generex Congratulates their Shareholders as FINRA has Officially Posted the Approval of the Generex Corporate Action and Payment of the Generex and NuGenerex Immuno-Oncology Stock Dividends on Monday, February 24, 2020*," and stated, in pertinent part, as follows:

Press Release | 02/24/2020

Dividends officially to be paid on Monday, February 24, 2020
• Shareholders to receive 2 to 5 stock dividend of Generex Biotechnology shares plus an additional 2 to 5 stock dividend of NuGenerex Immuno-Oncology shares
• Ex-Date will be February 25, 2020

MIRAMAR, Fla., Feb. 24, 2020 (GLOBE NEWSWIRE) -- Generex Biotechnology Corporation (www.generex.com) (OTCQB:GNBT) ("Generex") today announced that FINRA has officially posted the Generex 2:5 stock dividends in Generex and NuGenerex Immuno-Oncology to the FINRA web site, and the dividends will be paid on Monday, February 24, 2020. Remember that anyone who sells their shares before the market close on the ex-date of February 25th will lose the dividend, which will be transferred to the buyer of your shares.

Joe Moscato, President & CEO of Generex, said, "I would like to extend my congratulations and sincere thanks to our valued shareholders, because we can now officially declare that the stock dividends will be paid on Monday the 24th as FINRA has posted the approval of our corporate action on their web site. I would like to thank all of you for your patience and support of Generex throughout this process, which has delayed our plans for five months. We realize this delay has eroded share value, however, with the dividend paid, we are now we are poised for growth and success."

Mr. Moscato continued, "With the dividend being paid next week, and our Generex S-1 registration statement filed, we can now execute fully on our plans. As a first step next week, we will be filing an S-1 for the spin out of NuGenerex Immuno-Oncology, with goal of listing directly onto the Nasdaq. With the S-1 funding, our subsidiaries can increase manufacturing, sales & marketing, and distribution of our revenue generating products. Our subsidiaries MediSource and Pantheon are already delivering sales growth of nearly 400% year over year, and we can now scale manufacturing to expand this growth. As Excellagen continues to gain approval from VAC committees in the VA system, we can expand the Olaregen sales force and implement our product line extension with Excellagen Aesthetics into the aesthetic dermatology market. We will turn on our public company MSO for orthopedic surgeons and podiatrists, and we will build NuGenerex Health in Arizona to deliver an integrated, multi-disciplinary diabetes management solution with our physician partners and continuing our efforts in diabetes, we will close on our acquisition of ALTuCELL, which is initiating human clinical trials of implanted cellular therapy using Altucaps for the treatment of Type I diabetes. We are excited about our opportunities to deliver exceptional value to our shareholders in 2020 as we achieve the success that we envisioned when we took over the company three years ago."

41.    Upon information and belief, the Defendants' statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same

to the Plaintiff. As further specificity as to the false, and misleading statement, the Defendant publicly asserted that,

> "… Dividends officially to be paid on Monday, February 24, 2020
> • Shareholders to receive 2 to 5 stock dividend of Generex Biotechnology shares plus an additional 2 to 5 stock dividend of NuGenerex Immuno-Oncology shares
> • Ex-Date will be February 25, 2020
>
> ("Generex") today announced that FINRA has officially posted the Generex 2:5 stock dividends in Generex and NuGenerex Immuno-Oncology to the FINRA web site, and the dividends will be paid on Monday, February 24, 2020. Remember that anyone who sells their shares before the market close on the ex-date of February 25th will lose the dividend, which will be transferred to the buyer of your shares."

42.   Upon information and belief, the Defendants' statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff. As further specificity as to the false, and misleading statement, the Defendant publicly asserted that,

> Joe Moscato, President & CEO of Generex, said, "I would like to extend my congratulations and sincere thanks to our valued shareholders, because we can now officially declare that the stock dividends will be paid on Monday the 24th as FINRA has posted the approval of our corporate action on their web site. I would like to thank all of you for your patience and support of Generex throughout this process, which has delayed our plans for five months. We realize this delay has eroded share value, however, with the dividend paid, we are now we are poised for growth and success."

43.   Upon information and belief, the Defendants' statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff. As further specificity as to the false, and misleading statement, the Defendant publicly asserted that,

> Mr. Moscato continued, "With the dividend being paid next week, and our Generex S-1 registration statement filed, we can now execute fully on our plans. As a first step next week, we will be filing an S-1 for the spin out of NuGenerex Immuno-Oncology, with goal of listing directly onto the Nasdaq. With the S-1 funding, our subsidiaries can increase manufacturing, sales & marketing, and distribution of our revenue generating products….We are excited about our opportunities to deliver exceptional value to our shareholders in 2020 as we achieve the success that we envisioned when we took over the company three years ago."

25

44.     Upon information and belief and as subsequent events demonstrated, Defendant GNBT awarded and delivered dividend shares to its investors on an arbitrary and capricious manner, in accordance with the whims and decisions of its CEO, Joseph Moscato, which caused such statements to be false, misleading and omitted material information, which the reasonable investor would deem important to its investment, while having a duty to disclose the same to, *inter alia*, the Plaintiff, which relied upon the same, to its detriment.

45.     Solely as a further example of the material misrepresentations, omissions and/or misleading or false information, of the Defendants, on or about February 26, 2020, the Company issued a further press release as a "clarification" of its declaration of a stock dividend, entitled "*Generex Issues Clarification on Stock Dividends*," and stated, in pertinent part, as follows:

> Press Release | 02/26/2020
>
> Dividends officially paid on Monday, February 24, 2020
> °  Ex-Dividend Date does not apply to NuGenerex Immuno-Oncology shares
>
> MIRAMAR, Fla., Feb. 26, 2020 (GLOBE NEWSWIRE) -- Generex Biotechnology Corporation (www.generex.com) (OTCQB:GNBT) ("Generex") today clarified certain information regarding its stock dividends consisting of two shares of Generex stock for every five shares held, and two shares of NuGenerex Immuno-Oncology for every five shares of Generex.
>
> These are two separate dividends. Information in our previous press release discussing the ex-dividend date and ramifications of the ex-dividend date apply only to the dividend of Generex shares. There is no Ex-Dividend Date for the NuGenerex Immuno-Oncology shares because those shares do not trade. The payment date for the NuGenerex Immuno-Oncology shares was February 24, and the market effective date is today.
>
> Joe Moscato, President & CEO of Generex, said, "I understand there have been several questions from brokers and shareholders on this issue, and hope this clarifies it for everyone. In addition, now that the dividend is finally paid after many attempts, our next big initiative is to file the S1 for NGIO and take it public directly to the Nasdaq stock exchange, unlock its value, as well as close AltuCell. We continue the negotiations with our Chinese partnered agreements for our Coronavirus Vaccine initiative, we have our Chinese visas from our official invitations from our potential Chinese partners and are ready to go to China once we are finalized on our contract."

46.     Upon information and belief, the Defendants' statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff. As further specificity as to the false, and misleading statement, the Defendant publicly asserted that,

> Dividends officially paid on Monday, February 24, 2020
> ° Ex-Dividend Date does not apply to NuGenerex Immuno-Oncology shares
>
> Generex Biotechnology Corporation (www.generex.com) (OTCQB:GNBT) ("Generex") today clarified certain information regarding its stock dividends consisting of two shares of Generex stock for every five shares held, and two shares of NuGenerex Immuno-Oncology for every five shares of Generex."

47.     Upon information and belief, the Defendants' statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff. As further specificity as to the false, and misleading statement, the Defendant publicly asserted that,

> These are two separate dividends. Information in our previous press release discussing the ex-dividend date and ramifications of the ex-dividend date apply only to the dividend of Generex shares. There is no Ex-Dividend Date for the NuGenerex Immuno-Oncology shares because those shares do not trade. The payment date for the NuGenerex Immuno-Oncology shares was February 24, and the market effective date is today.

48.     Upon information and belief, the Defendants' statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff. As further specificity as to the false, and misleading statement, the Defendant publicly asserted that,

> "Joe Moscato, President & CEO of Generex, said, "I understand there have been several questions from brokers and shareholders on this issue, and hope this clarifies it for everyone. In addition, now that the dividend is finally paid after many attempts, our next big initiative is to file the S1 for NGIO and take it public directly to the Nasdaq stock exchange, unlock its value…."

49.     Upon information and belief and as subsequent events demonstrated, Defendant GNBT awarded and delivered dividend shares to its investors on an arbitrary and capricious manner, in accordance with the whims and decisions of its CEO, Joseph Moscato, which caused such statements to be false, misleading and omitted material information, which the reasonable investor would deem important to its investment, while having a duty to disclose the same to, *inter alia*, the Plaintiff, which relied upon the same, to its detriment.

50.     The Plaintiff alleges that the statements by the Defendant, as issued by its CEO, Joseph Moscato, were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff. The Plaintiff has yet to receive its February 13, 2020 stock dividends of 400,000 shares of the Company's common stock, or receive the stock dividend of 400,000 shares of Defendant NGIO common stock.

51.     The Plaintiff alleges that the statements by the Defendant, as issued by its CEO, Joseph Moscato, were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff, as Auctus has yet to receive its August 2019 stock dividend of 1,000,000 shares of the NGIO's common stock.

52.     As a further example of such material misrepresentations, omissions and/or misleading or false information, on or about March 12, 2020, the Defendant published and disseminated certain statements, "*Generex Subsidiary NuGenerex Immuno-Oncology (Formerly Antigen Express) Files Form 10 Registration Statement with the Securities and Exchange Commission*" which provided, in pertinent part, as follows:

Press Release | 03/12/2020

- NuGenerex Immuno-Oncology (NGIO) is focused on modulation of the immune system to develop Ii-Key peptide vaccines for the treatment and prevention of cancer and infectious diseases
- NGIO advancing Ii-Key peptide vaccines into development with partners in the United States and China in an effort to slow the coronavirus pandemic

MIRAMAR, Fla., March 12, 2020 (GLOBE NEWSWIRE) -- Generex Biotechnology Corporation(www.generex.com)(OTCQB:GNBT)(http://www.otcmarkets.com/stock/GNBT/quote) today announced that the company's subsidiary NuGenerex Immuno-Oncology (NGIO) has filed the initial public filing of a Form 10 Registration Statement with the U.S. Securities and Exchange Commission (the "SEC"). The registration of NGIO's securities with the SEC provides investors detailed information, including an overview of business strategies and audited financial statements.

Once the Form 10 becomes effective 60 days from the filing date, NGIO will be a fully reporting company with the SEC, subject to quarterly, annual and other reporting requirements. NGIO intends to utilize an increased market presence and potential support of institutional investors to aid a growth and acquisition strategy. It is NGIO's intent to list its common stock on a national securities exchange upon meeting certain financial and regulatory requirements.

Generex President and CEO Joe Moscato said, "We are happy to announce the filing of Form 10 Registration Statement for our subsidiary. We have issued a number of NGIO shares to our shareholders through two dividend payments. Once the SEC approves the filing, and the registration becomes effective, we plan to file a Registration Statement on Form S-1 with the SEC to sell shares and apply to list NuGenerex Immuno-Oncology as a separate, publicly traded Nasdaq company. With this listing, Generex and our shareholders should be able to realize the true value of our immune system activation technology that we are developing for cancer immunotherapy. In addition to expanding our oncology clinical development program of AE37 in combination with Merck's Keytruda® for the treatment of triple negative breast cancer, we plan to initiate clinical trials of AE37 in bladder cancer and begin clinical trials in additional cancer indications with our other Ii-Key peptide vaccines."

Mr. Moscato continued, "Further, as the COVID-19 pandemic has become a true public health threat, the value of our Ii-Key technology for the treatment and prevention of infectious diseases is being recognized by government agencies around the world. In response to this global health crisis, our team at NGIO has been able to restart the pandemic virus rapid vaccine development program from a decade ago, and we are currently working with our partner EpiVax on epitope mapping and computational vaccinology, as well as with our Chinese partners at the China Technology Exchange to have a vaccine ready for human testing in the next few months. We are also initiating discussions with U.S. and Canadian health authorities to advance our Ii-Key peptide vaccine technology to the clinic here in North America. We will keep our shareholders updated as we progress in our coronavirus vaccine development program using Ii-Key peptides to activate the immune system for protection from COVID-19."

53.     Upon information and belief, the Defendants' statements were incomplete,

misleading, and/or misrepresentative or omitted material information with a duty to disclose the same

to the Plaintiff. As further specificity as to the false, and misleading statement, the Defendant publicly asserted that,

> "Generex Biotechnology Corporation (www.generex.com) (OTCQB:GNBT) (http://www.otcmarkets.com/stock/GNBT/quote) today announced that the company's subsidiary NuGenerex Immuno-Oncology (NGIO) has filed the initial public filing of a Form 10 Registration Statement with the U.S. Securities and Exchange Commission (the "SEC"). The registration of NGIO's securities with the SEC provides investors detailed information, including an overview of business strategies and audited financial statements…."

54.     Upon information and belief, the Defendants' statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff. As further specificity as to the false, and misleading statement, the Defendant publicly asserted that,

> "Once the Form 10 becomes effective 60 days from the filing date, NGIO will be a fully reporting company with the SEC, subject to quarterly, annual and other reporting requirements. NGIO intends to utilize an increased market presence and potential support of institutional investors to aid a growth and acquisition strategy. It is NGIO's intent to list its common stock on a national securities exchange upon meeting certain financial and regulatory requirements…."

55.     Upon information and belief, the Defendants' statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff. As further specificity as to the false, and misleading statement, the Defendant publicly asserted that,

> "Generex President and CEO Joe Moscato said, "We are happy to announce the filing of Form 10 Registration Statement for our subsidiary. We have issued a number of NGIO shares to our shareholders through two dividend payments. Once the SEC approves the filing, and the registration becomes effective, we plan to file a Registration Statement on Form S-1 with the SEC to sell shares and apply to list NuGenerex Immuno-Oncology as a separate, publicly traded Nasdaq company. With this listing, Generex and our shareholders should be able to realize the true value of our immune system activation technology that we are developing for cancer immunotherapy…."

56.     Upon information and belief and as subsequent events demonstrated, Defendant GNBT awarded and delivered dividend shares to its investors on an arbitrary and capricious manner, in accordance with the whims and decisions of its CEO, Joseph Moscato, which caused such statements to be false, misleading and omitted material information, which the reasonable investor would deem important to its investment, while having a duty to disclose the same to, *inter alia*, the Plaintiff, which relied upon the same, to its detriment. *See, e.g.,* Joseph Moscato's Unsworn Declaration, filed in Texas Litigation, as attached, restated and incorporated herein as **Exhibit F**.

### 2)     The Defendant's SEC Form S-1 and GNBT's Misrepresentations and Omission of Material Facts

57.     On or about February 18, 2020, the Company filed its Form S-1 with the SEC which remains under consideration and is seeking, *inter alia*, to register 26,806,714 shares of its common stock, at a maximum price of $0.5555, for an aggregate maximum offering of $14,891,129.60. The Fund contends that the Company's Form S-1 is untrue and misleading, in violation of Sections 5, 11 and 12(a) of the Securities Act of 1933, *as amended*, 15 U.S.C. §§ 77a, *et seq.*, in that it fails to provide the reasonable investor with material information regarding this dispute, which such investor would require to make its investment decision as to the securities offering in accordance with the S-1. *See* Securities Act, 15 U.S.C. §§ 77e, 77k & 77l(a). *See GNBT's* Form S-1, dated February 18, 2020, as filed with the Commission, as attached, restated and incorporated by reference herein as **Exhibit G.**

58.     Upon  information and belief, the Defendant has not filed such amendment(s) to the Form S-1, which is currently pending and has not yet been declared effective, which cures and discloses such omissions of material facts, which the reasonable investor would deem important to its investment, while having a duty to disclose the same to, *inter alia*, the Plaintiff, which relied upon the same, to its detriment.

59.     Solely as an example, the Plaintiff contends that the Defendant's Form S-1's description of "*Legal Proceedings*" (Form S-1, at pp. 78-79 & pp. F-9 to F-11) is materially misleading and makes omissions of material fact regarding the litigation, as filed in or about May 2020 by Defendant GNBT against its new transfer agent (hereinafter "TA" or "Transfer Agent"), Security Transfer Corporation (hereinafter "STC"), in the 471st District Court of Collins County, Plano, Texas (hereinafter the "Texas Litigation"), obtaining a Temporary Restraining Order (hereinafter "TRO") and seeking a Temporary Injunction, precluding the TA from issuing shares to investors, including but not limited to the Plaintiff, upon delivering Notices of Conversion upon their convertible promissory notes,.

60.     In the Texas Litigation, the Defendant's CEO submitted an (unsworn) Declaration and claimed that if GNBT was

> "forced [to comply with it's contracts with investors] to put so many share into the market, Generex [GNBT] would not be able to recover those shares which would give a real and imminent probability that Generex [GNBT] going out of business."

*See* Moscato's Declaration (**Exhibit F**), at pp. 1-2; *see also* **Exhibit N**, *infra*.

61.     Upon information and belief, the Defendant, GNBT, has refused and failed to file a Form 8-K regarding the past and current events in the Texas Litigation, causing its representation in the Form S-1 to be materially misleading and containing omissions of material fact regarding the TA, the TRO precluding the issuance of GNBT securities, and the Texas Litigation, which the reasonable investor with material information regarding this dispute, which such investor would require to make an investment decision as to the GNBT securities.

62.     Solely as another example, the Plaintiff further contends that the Defendant's Form S-1's description of "*Legal Proceedings*" (Form S-1, at pp. 78-79 & pp. F-9 to F-11) is materially misleading and makes omissions of material fact regarding the litigation, as filed by Discover Growth Fund, LLC against GNBT and its CEO, Joseph Moscato, Case No. 1:20-cv-00233-RGA (U.S. Dist.

Ct., D. DE.) (hereinafter the "Delaware Litigation"), which the reasonable investor with material information regarding this dispute, which such investor would require to make an investment decision as to GNBT securities. *See* (**Exhibit G**).

63.     Upon information and belief, the Defendant, GNBT, has refused and failed to file a Form 8-K regarding the past and current events in the Delaware Litigation, causing its representation in the Form S-1 to be materially misleading and containing omissions of material fact regarding the Delaware Litigation, which the reasonable investor with material information regarding this dispute, which such investor would require to make an investment decision as to the GNBT securities.

64.     Solely as another example, the Plaintiff further contends that the Defendant's Form S-1's description of "*Legal Proceedings*" (Form S-1, at pp. 78-79 & pp. F-9 to F-11) is materially misleading and makes omissions of material fact regarding the breaches of the Transaction Documents  with Auctus, and the continuing breach caused by TRO which GNBT obtained in the Texas Litigation, which the reasonable investor with material information regarding this dispute, which such investor would require to make an investment decision as to GNBT securities. *See* (**Exhibits F, G & N**).

65.     Upon information and belief, the Defendant, GNBT, has refused and failed to file a Form 8-K regarding the past and current events as to the breaches of the Plaintiff's Transaction Documents, the impact of the TRO against the TA, STC, in the Texas Litigation, causing its representation in the Form S-1 to be materially misleading and containing omissions of material fact regarding the Plaintiff's Transaction Documents, the TRO and the Texas Litigation, which the reasonable investor with material information regarding this dispute, which such investor would require to make an investment decision as to the GNBT securities. *See* (**Exhibits F, G & N**).

66.     The Fund further asserts that the Defendant's Form S-1 is untrue and misleading in its description, entitled "*Notes Payable*" (Form S-1, at p. F-14) as to the convertible promissory notes

and fails to describe GNBT arbitrary breaches, *inter alia*, and denial of rights to stock dividends and conversion of debt, causing its representation in the Form S-1 to be materially misleading and containing omissions of material fact regarding the Defendant's arbitrary breaches of various convertible promissory notes, including but not limited to the Plaintiff's Transaction Documents, which the reasonable investor with material information regarding this dispute, which such investor would require to make an investment decision as to the GNBT securities. *See* (**Exhibits F, G & N).**

67.     The Fund further asserts that the Defendant's Form S-1 is untrue and misleading in its description in the provision as to "*Derivative Liability*" (Form S-1, at p. F-15) fails to fully describe the contingent liabilities arising from and fails to describe GNBT arbitrary breaches, *inter alia*, and denial of rights to stock dividends and conversion of debt, causing its representation in the Form S-1 to be materially misleading and containing omissions of material fact regarding the Defendant's derivative liability and the contingent liabilities arising from GNBT's arbitrary breaches of various convertible promissory notes, including but not limited to the Plaintiff's Transaction Documents, which the reasonable investor with material information regarding this dispute, which such investor would require to make an investment decision as to the GNBT securities. *See* (**Exhibits F, G & N).**

68.     Upon information and belief, the Defendant, GNBT, has refused and failed to file a Form 8-K regarding the Defendant's Notes Payable, including but not limited to the Plaintiff's Transaction Documents, and as to GNBT's Derivative Liability and contingent liabilities, causing its representation in the Form S-1 to be materially misleading and containing omissions of material fact regarding the Defendant's breaches of its various convertible promissory notes, including but not limited to the Plaintiff's Transaction Documents, and as to GNBT's derivative liability and contingent liabilities, which the reasonable investor with material information regarding this dispute, which such investor would require to make an investment decision as to the GNBT securities.

69.     The Fund further asserts that the Defendant's Form S-1 is untrue and misleading in its description in the provision as to "*Stockholders' Equity*" (Form S-1, at p. F-15) fails to fully describe the contingent liabilities arising from the GNBT's arbitrary breaches, *inter alia*, and denial of rights to stock dividends and conversion of debt, causing its representation in the Form S-1 to be materially misleading and containing omissions of material fact regarding the Defendant's derivative liability and the contingent liabilities arising from GNBT's arbitrary breaches of various convertible promissory notes, including but not limited to the Plaintiff's Transaction Documents, which the reasonable investor with material information regarding this dispute, which such investor would require to make an investment decision as to the GNBT securities. *See* (**Exhibits F, G & N**).

70.     Upon information and belief, the Defendant, GNBT, has refused and failed to file a Form 8-K regarding the Defendant's Stockholder's Equity, including but not limited to Auctus' equity arising from its Transaction Documents, causing its representation in the Form S-1 to be materially misleading and containing omissions of material fact regarding the Defendant's Stockholder's Equity, including but not limited to Auctus' equity arising from its Transaction Documents, which the reasonable investor with material information regarding this dispute, which such investor would require to make an investment decision as to the GNBT securities.

71.     As set forth herein, the Defendant has committed securities fraud and made material misrepresentations and omitted material information while having a duty to disclose the same to Auctus, *inter alia*, in connection with the offer, purchase and sale of GNBT securities, and in connection with the Transaction Documents, in detrimental reliance upon which the Plaintiff invested millions of dollars in the Company, to its detriment.

72.     As a direct and proximate cause of the violations of the federal securities laws of the Defendant, Plaintiff has suffered irreparable harm, and general, special, and consequential damages,

including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment, and resulted in the unjust enrichment of the Defendant.

3)     **The Defendants' SEC Form 10 and GNBT's and
NGIO's Misrepresentations and Omission of Material Facts**

73.     On or about March 12, 2020, Defendant NGIO, as approved by its parent company, Defendant GNBT, filed its Form 10 with the Commission which remains under consideration and is seeking, *inter alia*, to register shares of its common stock, in which its authorized capital stock consists of 750,000,000 shares, par value of $0.001 per share, 10,000,000 shares of preferred stock, $0.001 par value, and 400,000,000 shares of NGIO common stock outstanding. The Fund contends that Defendant NGIO's Form 10 is untrue and misleading, in violation of Sections 5, 11 and 12(a) of the Securities Act, and/or Sections 12(b) and/or 12(g) of the Exchange Act, in that it fails to provide the reasonable investor with material information regarding this dispute, which such investor would require to make its investment decision as to NGIO securities offering in accordance with the Form 10. *See* NGIO's Form 10 (**Exhibit E**).

74.     Upon  information and belief, Defendants NGIO and GNBT have not filed such amendment(s) to the Form 10, which is currently pending and has not yet been declared effective, which cures and discloses such omissions of material facts, which the reasonable investor would deem important to its investment, while having a duty to disclose the same to, *inter alia*, the Plaintiff, which relied upon the same, to its detriment.

75.     Solely as another example, the Plaintiff contends that the Defendant's Form 10's description of "*Security Ownership of Certain Beneficial Owners and Management*" (Form 10, at p. 12) is materially misleading and makes omissions of material fact regarding the NGIO shares of common stock, as beneficially owned by the Plaintiff, in accordance with its Transaction Documents executed with Defendant GNBT, which the reasonable investor would deem important to its

investment, while having a duty to disclose the same to, *inter alia*, the Plaintiff, which relied upon the same, to its detriment.

76.    Solely as another example, the Plaintiff contends that the Defendant's Form 10's description of "*Executive Compensation*" (Form 10, at p. 16), in which NGIO states, as approved by its parent, Defendant GNBT, that the Defendant "has no outstanding options or warrants," is materially misleading and makes omissions of material fact regarding the NGIO shares of common stock, as beneficially owned by the Plaintiff, in accordance with its Transaction Documents executed with Defendant GNBT, which the reasonable investor would deem important to its investment, while having a duty to disclose the same to, *inter alia*, the Plaintiff, which relied upon the same, to its detriment.

77.    Solely as another example, the Plaintiff contends that the Defendant's Form 10's description of *Legal Proceedings*" (Form 10, at p. 16), in which NGIO states, as approved by its parent, Defendant GNBT, that the Defendant is "not currently a party to any material legal proceedings, nor, to our knowledge, is any material legal proceeding threatened against" NGIO, is materially misleading and makes omissions of material fact regarding the Texas Litigation, as filed in or about May 2020 by Defendant GNBT against its Transfer Agent, STC, obtaining a TRO and seeking a Temporary Injunction, precluding the TA from issuing shares to investors, including but not limited to the Plaintiff, upon delivering Notices of Conversion upon their convertible promissory notes, which the reasonable investor would deem important to its investment, while having a duty to disclose the same to, *inter alia*, the Plaintiff, which relied upon the same, to its detriment.

78.    Solely as a further example, the Plaintiff contends that the Defendant's Form 10's description of *Legal Proceedings*" (Form 10, at p. 16), in which NGIO states, as approved by its parent, Defendant GNBT, that the Defendant is "not currently a party to any material legal proceedings, nor, to our knowledge, is any material legal proceeding threatened against" NGIO, is

materially misleading and makes omissions of material fact regarding the Delaware Litigation, which the reasonable investor would deem important to its investment, while having a duty to disclose the same to, *inter alia*, the Plaintiff, which relied upon the same, to its detriment.

79.    Solely as an additional example, the Plaintiff contends that the Defendant's Form 10's description of *Legal Proceedings*" (Form 10, at p. 16), in which NGIO states, as approved by its parent, Defendant GNBT, that the Defendant is "not currently a party to any material legal proceedings, nor, to our knowledge, is any material legal proceeding threatened against" NGIO, is materially misleading and makes omissions of material fact regarding the breaches of the Plaintiff's Transaction Documents, as arising from GNBT's arbitrary breaches of various convertible promissory notes, including but not limited to the Plaintiff's SPA's and Notes, which the reasonable investor with material information regarding this dispute, which such investor would require to make an investment decision as to the NGIO securities.

80.    As set forth herein, the Defendant has committed securities fraud and made material misrepresentations and omitted material information while having a duty to disclose the same to Auctus, *inter alia*, in connection with the offer, purchase and sale of NGIO securities, and in connection with the Transaction Documents, in detrimental reliance upon which the Plaintiff invested in the Company, to its detriment.

81.    As a direct and proximate cause of the violations of the federal securities laws of the Defendant, the Plaintiff has suffered irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment, and resulted in the unjust enrichment of the Defendant.

### C.    Events of Default and Defendants' Breaches of the Transaction Documents

82.    The Plaintiff asserts that the Defendants have incurred and/or caused several Events of Default, as set forth in Article III, entitled "*Events of Default*," of the Notes. These Events of Default included, *inter alia*, breaches of following provisions of the Transaction Documents: a) Section 1.2 (conversion price; b) Sections 1.3 (Authorized Shares); c) Sections 1.4(g) (Sub-penny conversion price); d) Section 1.4(h) (Failure to Deliver Common Stock prior to Delivery date); e) Section 1.6(c) (Adjustment due to Distribution); f) Section 2.8 (Non-circumvention); g) Section 3.1 (Failure to pay principal or interest); h) Section 3.2 (Failure to Honor Conversion); i) Section 3.4 (Breach of Agreements and covenants – Sections 2.8 of the Note (Non-circumvention) and 1.3 (Authorized Shares)); j) Section 3.5 (Breach of Representations and Warranties -Section 3(g) (SEC Documents; Financial Statements)) of the SPA by and between GNBT and Auctus dated August 14, 2019; k) Section 3.10 (Failure to Comply with the Exchange Act) and l) Section 4.14 (Failure to notify of Future Financing). *See* Note (**Exhibit D**), § 3.10. Such Events of Default, together with others, have occurred and continue to occur.

83.    For example, Section 3.2 of the Convertible Promissory Note, entitled "*Conversion and the Shares,*" states, in pertinent part, that an "Event of Default" occurs when,

> The Borrower *fails to issue shares of Common Stock to the Holder (or announces or threatens in writing that it will not honor its obligation to do so)* upon *exercise by the Holder of the conversion rights of the Holder in accordance with the terms of this Note*, fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) any certificate for shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, directs its transfer agent not to transfer or *delays, impairs, and/or hinders its transfer agent in transferring (or issuing)* (electronically or in certificated form) any certificate for shares of Common Stock *to be issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note,* fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any shares of Common Stock issued to the Holder upon conversion of *or otherwise pursuant to this Note as and when required by this Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any*

*such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for three (3) business days after the Holder shall have delivered an accurately calculated Notice of Conversion*, fails to remain current in its obligations to its transfer agent, causes a conversion of this Note is delayed, hindered or frustrated due to a balance owed by the Borrower to its transfer agent, fails to repay Holder, within seventy two (72) hours of a demand from the Holder, any amount of funds advanced by Holder to Borrower's transfer agent in order to process a conversion,  fails to reserve sufficient amount of shares of common stock to satisfy the Reserved Amount at all times as set forth herein, and/or an exemption under Rule 144 is unavailable for the Holder's deposit into Holder's brokerage account and resale into the public market of any of the conversion shares under this Note at any time after the date which is six (6) months after the date that the Holder funded the Purchase Price under this Note.

*See* (**Exhibit D**), § 3.2 (emphasis added).

84.     On or about May 6, 2020, and pursuant to the terms and conditions of the Purchase Agreement and the Notes, the Fund executed and delivered a certain Notice of Conversion (hereinafter the "Conversion Notice"), totaling $100,416.00, by which it elected to make a conversion of a portion of the principal and accrued interest, plus fees under the August 14th Note. *See* Plaintiff's Conversion Notice, as attached, restated and incorporated by reference herein as **Exhibit H**.

85.     It is undisputed that the Defendant failed to issue shares of its common stock to the Plaintiff after the submission of the Conversion Notice to the Company's TA, in accordance with Section 3.2 of terms and conditions of the Note and the Transaction Documents.

86.     Additionally, the Fund asserts that the Company has breached the Transaction Documents, and particularly the Notes, pursuant to, *inter alia*, Section 3.4, entitled "*Breach of Covenants*," which provides in pertinent part, that an Event of Default occurs when:

The *Borrower breaches any material covenant or other material term or condition contained in this Note* and any collateral documents including but not limited to the Purchase Agreement and such breach continues for a period of ten (10) days after written notice thereof to the Borrower from the Holder.

*See* (**Exhibit D**), § 3.4 (emphasis added).

87.     Furthermore, the Plaintiff asserts that GNBT has caused a breach of the Note pursuant to, *inter alia*, Section 3.5, entitled "*Breach of Representations and Warranties*," which provides in pertinent part, that an Event of Default occurs when:

> *Any representation or warranty of the Borrower made herein or in any agreement*, statement or certificate given in writing pursuant hereto or in connection herewith (including, without limitation, the Purchase Agreement), *shall be false or misleading in any material respect when made and the breach of which has (or with the passage of time will have) a material adverse effect on the rights of the Holder with respect to this Note* or the Purchase Agreement.

*See* (**Exhibit D**), § 3.5 (emphasis added).

88.     By the Transaction Documents, each Note gives Auctus the right to receive any and all distributions, stock dividends and/or other similar benefits, as provided to shareholders by Defendant GNBT. For example, Section 1.2 of the Notes, entitled "*Conversion Price*," provided, in pertinent part, as follows:

> The conversion price (the "Conversion Price") shall equal the Variable Conversion Price (as defined herein*) (subject to equitable adjustments for stock splits, stock dividends or rights offerings by the Borrower relating to the Borrower's securities or the securities of any subsidiary of the Borrower (during the Conversion Period), combinations, recapitalization, reclassifications, extraordinary distributions and similar events)*…. If the Trading Price cannot be calculated for such security on such date in the manner provided above, the Trading Price shall be the fair market value as mutually determined by the Borrower and the holders of a majority in interest of the Notes being converted for which the calculation of the Trading Price is required in order to determine the Conversion Price of such Notes. "Trading Day" shall mean any day on which the Common Stock is tradable for any period on the OTC Pink, OTCQB or on the principal securities exchange or other securities market on which the Common Stock is then being traded. "Applicable Percentage" shall mean 20%.

*See* (**Exhibits B & D**), § 1.2 (emphasis added).

89.     Furthermore, Section 1.6, entitled the "*Effect of Certain Events*," also expressly provided that the Plaintiff had the right to adjustments arising from, *inter alia*, stock dividends and other specific corporate events. Thus, Section 1.6(c) of each Note, entitled the "*Adjustment due to Distribution*," provided, in pertinent part, as follows:

If the *Borrower shall declare or make any distribution* of its assets *to holders of Common Stock* as a dividend, stock repurchase, by way of return of capital or otherwise (including any *dividend or distribution* to the Borrower's *shareholders in* cash or *shares* (or rights to acquire shares) of capital stock of a subsidiary (i.e., a spin-off)) (a "Distribution"), then the *Holder of this Note shall be entitled, upon any conversion of this Note after the date of record for determining shareholders entitled to such Distribution, to receive the amount of such assets which would have been payable to the Holder with respect to the shares of Common Stock issuable upon such conversion had such Holder been the holder of such shares of Common Stock on the record date* for the determination of shareholders entitled to such Distribution. Notwithstanding the foregoing, the Holder hereby waives the right to any dividend arising from any contemplated uplisting within 180 days from the Issue Date hereof.

*See* (**Exhibits B & D**), § 1.6(c) (emphasis added).

90.      By the Transaction Documents, in connection with the issuance of the August 14, 2019 Note, the Plaintiff entered into an investment contract with Defendants GNBT and NGIO for the issuance of 1,000,000 shares of NGIO common stock (hereinafter the "NGIO Shares" f/k/a the "Antigen Shares"), as a commitment fee for the investment, As memorialized by the Transaction Documents. *See* (**Exhibit C**) § 1(a); *see also* Email Correspondence between Plaintiff and Defendants, at p.17, dated August 19, 2019 ("Guys please get the 1 million shares book entries into Auctus at TA for Antigen" n/k/a NGIO), as attached, restated and incorporated by reference herein as **Exhibit I**; *see also id.* (Email Thread of Plaintiff and Defendants), of various dates.

91.      Furthermore, it is undisputed that as of on or about February 13, 2020, the Plaintiff was a shareholder of record in Defendant GNBT, together with its wholly-owned subsidiary, NGIO, and holding 1,000,000 GNBT shares of common stock.

92.      In or about February 2020, Defendants GNBT and NGIO declared a stock dividend, obligating the Defendants to deliver 400,000 GNBT shares and 400,000 NGIO shares to the Plaintiff, in accordance therewith.

93.      As of the date hereof, the Defendants have failed to deliver the 400,000 GNBT shares and 400,000 NGIO Shares to the Plaintiff, 400. *See* Broadridge Financial Solutions Corp. (hereinafter

"Broadridge") Booking Statement, as transfer agent for Defendant GNBT, f/b/o Plaintiff Auctus, dated February 26, 2020, as attached, restated and incorporated herein as **Exhibit J**; *see also* Email Correspondence between Transfer Agent STC and Plaintiff Auctus, dated March 9, 2020, as attached, restated and incorporated herein as **Exhibit K**; Defendant NGIO Account Statement, dated March 13, 2020, as attached, restated and incorporated herein as **Exhibit L**.

94.     As of the date of this filing and in direct contravention of their contractual obligations, Defendants GNBT and NGIO have continued to refuse to deliver the GNBT Shares or deliver the NGIO Shares to the Plaintiff, to its detriment and has caused substantial damages, lost profits, and lost opportunity to Auctus. To the current date, the Defendants have continued to obstruct and deny their contractual obligations to Auctus, thereby causing further Events of Default under the Notes and the Transaction Documents.

**D.     The Texas Litigation and GNBT's Further Breach of Transaction Documents**

95.     As a result of the Company's contentious relationship with Broadridge its transfer agent, in or about March 2020, the Defendant informed, *inter alia*, the Plaintiff and/or others, indicating that GNBT had engaged STC as its new Transfer Agent.

96.     In accordance with its obligations under the Transaction Documents, the Company signed an "*Irrevocable Transfer Agent Instructions Letter*" with STC, for the benefit of the Plaintiff, which provides, in pertinent part, as follows:

> The shares will be issues within *three (3) business days upon receipt of the Notice of Conversion*. The ability to convert the Note in a timely manner in a material obligation of the Company pursuant to the Note. The ability to exercise the Warrant in a timely manner is a material obligation of the Company pursuant to the Warrant. Your firm is *hereby irrevocably authorized and instructed* to issue Common Stock of the Company (without any restrictive legend) to the Investor *without any further action by the Company*…

*See* Irrevocable Transfer Agent Instructions Letter, dated March 10, 2020, as attached, restated and incorporated herein as **Exhibit M** (emphasis added).

97.     Within two (2) months, however, the Defendant was embroiled in a new controversy with its recently appointed Transfer Agent, as STC insisted on actually complying with the "*irrevocable*" nature of the TA Instructions Letter, and informed GNBT that it intended to issue GNBT Shares, as required, upon its receipt of Notice of Conversion from the Plaintiff and other holders of convertible promissory notes with the Defendant.

98.     Thus, on or about May 11, 2020, the Company filed a Petition, and supporting papers against STC in the Texas Litigation. *See* GNBT's Petition, Application for Temporary Restraining Order (hereinafter "TRO") and Request for Disclosure, *Case No. 471-02429-2020*, as attached, restated and incorporated herein as **<u>Exhibit N</u>**.

99.     The Plaintiff was not named as a party in the Texas Litigation, and was not served or provided with other notice of its pendency prior to the Texas state court's Zoom hearing on the Application for a TRO.

100.     By its Application for a TRO, Defendant GNBT submitted a [Proposed] Order for entry by the Texas state court which would find, on an emergency basis, that

> "Plaintiff will suffer severe dilution in the value of its stock, and that any issuance of shares or note conversion will start a "death spiral" from which the stock value will never recover, and which probably will result in the loss of Plaintiff's entire business."

*See* **<u>(Exhibit N)</u>**.

101.     In support of Application for a TRO, the Defendant's CEO submitted an (unsworn) Declaration and asserted that if GNBT was

> "forced [to comply with the investment contracts with its investors] to put so many share into the market, Generex would not be able to recover those shares which would give a real and imminent probability that Generex going out of business."

*See* Joseph Moscato's Unsworn Declaration pp. 1-2, as filed in the Texas Litigation, as attached, restated and incorporated by reference herein as **<u>Exhibit F</u>**; *see also* **<u>Exhibit N</u>**, *infra*.

102.     Defendants GNBT and NGIO had never disclosed such dire consequences or the potential for a "death spiral" to the Plaintiff, or in any of the Defendants' SEC filings or otherwise, including but

not limited to the Form S-1, Form 10 or in any Form 8-K, in direct contravention of the federal securities laws and the Commission's rules and regulations.

103.    Faced with Defendant GNBT's prediction of a "death spiral" and "a real and imminent probability that Generex going out of business" if STC, as Transfer Agent, honored "Irrevocable" Letters of Instruction, including such Irrevocable Letter for the benefit of the Plaintiff, on or about May 12, 2020, the Texas state court entered the TRO, on an emergency basis, finding that

> The Court further finds that calculating damages attributable to such "death spiral" will be nearly impossible. Accordingly, the Court finds that such harm is irreparable and without adequate remedy at law….

> the Court finds that such harm is imminent, based on Plaintiff's evidence that Defendant intends to engage in the issuance of stock or execution of note conversions as soon as tomorrow, March 13, 2020. This necessitates emergency relief in the form of a temporary restraining order….

> IT IS THEREFORE ORDERED that Defendant Securities Transfer Corp., together with its agents, representatives, or any other persons acting in concert with Defendant or on Defendant's behalf who have notice of this order, are enjoined from issuing any shares of stock of Generex Biotechnology Corp. until May 20, 2020.

*See* TRO *(***Exhibit N)**, at p.43.

104.    Thus, by obtaining the TRO in the Texas Litigation, Defendant GNBT precluded STC, as its Transfer Agent, from honoring any request for conversions by, inter alia, the Plaintiff, breaching the Transaction Documents and the Irrevocable Transfer Agent Letter and causing Auctus significant damages and lost profits, to its detriment.

105.    Indeed, in or about May 2020 and after the entry of the TRO in the Texas Litigation, STC was forced to reject the Plaintiff's Notice of Conversion and refused to issue GNBT Shares to Auctus in accordance with the Transaction Documents.

106.    Originally scheduled for May 19th Zoom hearing as to whether to issue a Preliminary (Temporary) Injunction, at the Defendant's request, the Texas state court has continued such Zoom hearing to June 1, 2020

107. As of the filing of this Complaint, the TRO continues to be in effect and the Transfer Agent has been rejected any Notice of Conversion and/or issuance of GNBT Shares to Auctus, to its detriment.

108. As of the date hereof, the Plaintiff intends to seek to intervene in the Texas Litigation and to oppose the entry of a Preliminary (Temporary) Injunction by the Texas state court.

109. It is undisputed that the Defendant's filing of the Texas Litigation and its request and the entry of the TRO are have, and continuing, breaches of the Transaction Documents, to the detriment of the Plaintiff.

110. Upon the occurrence of an Event of Default under  the Transaction Documents, the entire principal and accrued interest shall be immediately due and owing from Defendant GNBT. Furthermore, pursuant to Section 3 of the Notes, the Company is required to pay, and shall pay, the "Default Sum" (as defined therein), due under the Note as multiplied by Two Hundred and 00/100 (200.00%) percent. Thus, as of May 13, 2020 and under the Transaction Documents, the Company owes the Plaintiff the Default Sum totaling Nine Hundred – Fifteen Thousand –Seven Hundred – Eighty-Nine and 82/100 (**$915,789.82**) Dollars (U.S.). *See* **Exhibit 1**, as attached, restated and incorporated by reference herein. Until paid, the Default Sum shall continue to accrue the default interest rate of Twenty-four and 00/100 (24.00%) percent per year, provided by the Note.

111. As further and additional damages under the Transaction Documents, Defendant GNBT is obligated to compensate the Plaintiff for its "lost opportunity" and "lost profits" arising from its refusal, in or about February 2020, to deliver the 400,000 GNBT Shares in accordance with the stock dividend, as declared by the Company. Based upon the trading activity after the Defendant's refusal to timely deliver such GNBT Shares representing the stock dividend, the Plaintiff asserts that GNBT is also liable for approximately $500,000.00 in general and consequential damages therefor.

112.    As further and additional damages under the Transaction Documents, Defendants GNBT and NGIO are obligated to compensate the Plaintiff for its "lost opportunity" and "lost profits" arising from its refusal, in or about 2019 and 2020, to deliver the 1,400,000 NGIO Shares in accordance with the investment contracts between the Plaintiff, GNBT and NGIO. Based upon NGIO's Form 10 according a valuation of $0.10 /share of NGIO common stock, the Plaintiff asserts that GNBT and NGIO are also liable, jointly and severally, for approximately $140,000.00 in general and consequential damages therefor. *See* NGIO Form 10 (**Exhibit N**), at p. F-5.

113.    Thus, under the Transaction Documents, the Plaintiff contends that Defendants are liable for general and consequential damages, *inter alia*, lost profits and lost opportunity, totaling One Million - Five Hundred – Fifty – Five Thousand –Seven Hundred – Eighty-Nine and 82/100 (**$1,555,789.82**) Dollars (U.S.).

114.    In sum, the Defendants have committed breached the Transaction Documents, and committed federal securities fraud, perpetrating a fraud and deceit upon the Plaintiff, which has suffered as a consequence. The Defendants have been unjustly enriched and converted the Plaintiff's assets, causing it to suffer further damages and injuries. As a result of the fraudulent scheme, actions, concealment, and omissions of the Defendants, the Plaintiff suffered damages of $1,555,789.82, to its detriment.

## V. <u>VIOLATIONS OF LAW</u>

### <u>COUNT I - VIOLATIONS OF FEDERAL SECURITIES LAWS</u>

115.    The Plaintiff reasserts Paragraphs 1 through 114 of the Complaint, together with **<u>Exhibits</u>**, and restates and incorporates them herein by reference.

116.    The Defendants violated the Securities Act, 15 U.S.C §77a, *et seq.,* in addition to Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, in that, as described herein, and in connection with the purchase, offer and sale of securities, they knowingly, recklessly and intentionally:

> a)    employed manipulative and deceptive devices and contrivances;
>
> b)    employed devices, schemes and artifices to defraud;
>
> c)    made untrue statements of material fact and omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and
>
> d)    engaged in acts, practices and a course of business which operated as a fraud or deceit upon the Plaintiff.

117.    As a direct and proximate cause of the violations of the federal securities laws by the Defendants, Plaintiff has suffered, and continues to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment, and resulted in the unjust enrichment of the Defendants.

### <u>COUNT II - VIOLATIONS OF MASSACHUSETTS STATE SECURITIES LAWS</u>

118.    The Plaintiff reasserts Paragraphs 1 through 117 of the Complaint, together with **<u>Exhibits</u>**, and restates and incorporates them herein by reference.

119.    The Defendants violated the Massachusetts Uniform Securities Act, Massachusetts General Laws Chapter 110A, §§ 101, *et seq.*, *as amended*, in that, as described herein, it offered and sold securities by means of untrue statements of material fact.

120.    The Defendants recklessly and intentionally misrepresented material information and omitted disclosure of material information to the Plaintiff in connection with the offer, purchase and sale of securities in the Commonwealth of Massachusetts.

121.    As a direct and proximate cause of the violations of the Massachusetts state securities laws by the Defendants, Plaintiff Auctus has suffered, and continues to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment, and resulted in the unjust enrichment of the Defendants.

## **COUNT III – "CONTROL PERSON" LIABILITY**

122.    The Plaintiff reasserts Paragraphs 1 through 121 of the Complaint, together with **Exhibits**, and restates and incorporates them herein by reference.

123.    During the relevant time period and as set forth herein, the Defendants are, and were during the relevant time, "control persons" within the meaning of Section 15 of the Securities Act, and Section 20(a) of the Exchange Act.

124.     In addition to their direct liability, the Defendants, GNBT and NGIO, are liable to the Plaintiff for the conduct of such individual(s), as described herein, in that:

        a)    at all times material hereto, the Defendants controlled certain individual(s), in their employ and/or subject to their authority, supervision and/or control, respectively, directly or indirectly;

        b)    at all times material hereto and with respect to all of the transactions and misrepresentations described herein, such individual(s), in their employ and/or

subject to their authority, supervision and/or control, respectively, and/or as officers, employees and/or agents of the Defendants;

c)      at all times material hereto, the Defendants failed to have policies, practices and/or procedures in effect, which were adequate, sufficient, necessary and/or appropriate in order to monitor and supervise the actions of such individual(s), as described herein, and adequate, sufficient, necessary and/or appropriate to prevent said actions from occurring and continuing to occur; and

d)      at all times material hereto, the Defendants, with respect to the Plaintiff's investment in GNBT Shares and in NGIO Shares, failed to properly or sufficiently implement, execute and/or utilize the policies, practices and/or procedures which they had in effect and which purportedly were intended and designed to monitor and supervise the actions of such individual(s), described herein and to prevent said actions from occurring and continuing to occur.

125.    The Defendants, jointly and severally, singly and in concert, directly and/or indirectly, benefitted from fees, profits, gains, interest, commissions and/or other monies, as derived from the conduct of such individual(s), as described herein.

126.    As "control persons," the Defendants are liable for the false and fraudulent actions, practices, courses of conduct and/or omissions of those controlled persons committing a fraud and deceit in connection with the offer, purchase and/or sale of GNBT securities and/or NGIO securities, at the time of the wrongs alleged herein and as set forth herein, within the meaning of Section 15 of the Securities Act and Section 20(a) of the Exchange Act, as the Defendants had the supervision, power, authority, and influence over such controlled persons, and exercised the same as described herein.

127.     The Defendants' control, authority, supervision and/or positions made them privy to and provided them with knowledge, actual and/or apparent, as to the material misrepresentations and the omissions of material facts, with a duty to disclose, as to the Plaintiff.

128.      As a direct and proximate cause of the "control person" liability of the Defendants, the Plaintiff has suffered, and continues to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment, and resulted in the unjust enrichment of the Defendants.

## COUNT IV – BREACHES OF CONTRACT

129.     The Plaintiff reasserts Paragraphs 1 through 128 of the Complaint, together with **Exhibits**, and restates and incorporates them herein by reference.

130.     Pursuant to the Purchase Agreements and the Notes, the Fund invested in GNBT and in NGIO and sought to become a shareholder, in good faith, to join the Defendants in the accomplishment of their respective business goals and in accordance with the standards of the business and the securities industry.

131.     The Plaintiff alleges that the Defendants are liable for breaches of contract. A breach of contract is failure without excuse to perform a duty which is due under the contract. Additionally, the interpretation of a contract is a question of law, not fact. If the wording is not ambiguous, then the contract must be enforced according to its plain terms.

132.     The Plaintiff performed its obligations under the Transaction Documents, and in good faith.

133.     The Defendants, by their conduct and as described herein, violated the Transaction Documents, breaching their contracts with the Plaintiff.

134.     As a direct and proximate cause of the Defendants' breaches of their contracts, the Plaintiff has suffered, and continues to suffer, irreparable harm, and general, special, and

consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment.

## COUNT V – BREACHES OF IMPLIED
## COVENANT OF GOOD FAITH-FAIR DEALING

135.   The Plaintiff reasserts Paragraphs 1 through 134 of the Complaint, together with **Exhibits**, and restates and incorporates them herein by reference.

136.   It is well established in that every contract carries an implied covenant of good faith and fair dealing whereby the parties treat each other fairly and act in good faith and no party to the contract shall take any action to harm another party's rights under the contract. The duty imposed by this "implied covenant of good faith and fair dealing" pertains to bad faith in the performance of a contract, not just in its execution or negotiation. Implicit in every contract is the requirement on faithfulness to an agreed upon common purpose and consistency with the justified expectations of the other party.

137.   A breach of contract is the failure to perform for which legal excuse is lacking. As a matter of law, a contract existed, which the Defendants breached and failed to comply with the covenant of good faith and fair dealing. The law is clear - the Plaintiff had binding contracts and the Defendants had no legal basis, as a matter of law, to avoid their respective obligations under the Transaction Documents, including but not limited to damages which arose, and which might arise, as a result from the breach of such Transaction Documents.

138.   The Defendants had a duty of good faith and fair dealing in their dealings with the Plaintiff and pursuant to the promises, contracts, and statements made to the Plaintiff to induce it to enter into the contracts and provide investment assets to the Defendants in exchange for their promise to honor their obligations under the same.

139.    Under the covenant, the Defendants were obligated to a good faith performance of their obligations under the Transaction Documents with Auctus, and to be faithful and consistent to the justified expectations of the Plaintiff.

140.    As described above, the Defendants breached the implied covenant of good faith and fair dealing with the Plaintiff.

141.    As a direct and proximate cause of the Defendants' breaches of the implied covenant of good faith and fair dealing, the Plaintiff has suffered, and continues to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment.

## COUNT VI – UNJUST ENRICHMENT

142.    The Plaintiff reasserts Paragraphs 1 through 141 of the Complaint, together with the **Exhibits**, and restates and incorporates them herein by reference.

143.    The Defendants' illegally received assets and benefits from the Plaintiff, as arising from its false and fraudulent statements and misrepresentations, and without providing equivalent value therefor.

144.    The Defendants' actions, courses of conduct, and omissions were wantonly, intentionally, and maliciously conducted against the Plaintiff, to its detriment.

145.    The Defendants have been unjustly enriched by their actions, as described herein.

146.    As a direct and proximate cause of the Defendants' unjust enrichment, the Plaintiff has suffered, and continues to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment.

## COUNT VII – BREACH OF FIDUCIARY DUTY

147.    The Plaintiff reasserts Paragraphs 1 through 146 of the Complaint, together with the **Exhibits**, and restates and incorporates them herein by reference.

148.    A fiduciary relationship existed between the Plaintiff and the Defendants, requiring them to act with a duty of the utmost loyalty and trust on behalf of the Plaintiff.  As a fiduciary, the Defendants were required to maintain and protect the welfare of the Plaintiff.

149.    By engaging in the conduct described herein, the Defendants breached their fiduciary duties to the Plaintiff.

150.    As a direct and proximate cause of the Defendants' breaches of fiduciary duty, the Plaintiff has suffered, and continues to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment.

## COUNT VIII – FRAUD AND DECEIT

151.    The Plaintiff reasserts Paragraphs 1 through 150 of the Complaint, together with the **Exhibits**, and restates and incorporates them herein by reference.

152.    The actions of the Defendants described herein constitute fraud and deceit, including but not limited to the following:

    a)    the Defendants made false representations of material facts, and/or omitted material facts with a duty of disclosure, knowing or having reason to know of their falsity;

    b)    the Defendants made said misrepresentations and omissions for the purpose of inducing reliance from the Plaintiff; and

    c)    the Plaintiff did rely upon said misrepresentations and omissions, to its detriment.

153.    As a direct and proximate cause of the Defendants' fraud and deceit, the Plaintiff has suffered, and continues to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment.

## COUNT IX - NEGLIGENT MISREPRESENTATION

154.    The Plaintiff reasserts Paragraphs 1 through 153 of the Complaint, together with **Exhibits**, and restates and incorporates them herein by reference.

155.    The conduct of the Defendants as described herein constitutes negligent misrepresentation because the Defendants negligently provided the Plaintiff with erroneous and misleading information, and negligently omitted material information with a duty to disclose, to the Plaintiff's detriment.

156.    As a direct and proximate cause of the Defendants' negligent misrepresentations, the Plaintiff has suffered, and continues to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment.

## COUNT X - VIOLATIONS OF MASSACHUSETTS
## CONSUMER PROTECTION ACT / M.G.L. C. 93A, §§ 2 & 11

157.    The Plaintiff reasserts Paragraphs 1 through 156 of the Complaint, together with the **Exhibits**, and restates and incorporates them herein by reference.

158.    At all relevant times herein, the Defendants conducted a trade or business, as defined by the Massachusetts Consumer Protection Act, M.G.L. c. 93A, within the Commonwealth of Massachusetts.

159.    The conduct of the Defendants as described herein, constitutes unfair and deceptive trade practices, and unfair competition, under Sections 2 and 11 of the Consumer Protection Act, including but not limited to claims that the Defendants:

a)    executed the Transaction Documents with full knowledge and understanding of the Defendant's obligations to the Plaintiff;

b)    fraudulently induced the Plaintiff to invest in the Company and thereby breached its promises to the Plaintiff;

c)    fraudulently concealed from the Plaintiff the full and complete financial and operational details and prospects of the Company in inducing the Plaintiff to make its investment in the Company;

d)    has fraudulently exposed the Plaintiff to virtually unlimited financial risk as may arise from filing the Litigation in Texas against its TA, refusing to pay the Fund its dividends and refusing to allow its Notice of Conversion;

e)    knowingly and intentionally concealed these activities from the Plaintiff, to its detriment; and/or

f)    violated the requirements, terms and conditions of existing statutes, rules and regulations meant for the protection of the public's health, safety or welfare.

160.    As a direct and proximate cause of the Defendants' violations of the Massachusetts Consumer Protection Act, M.G.L. c. 93A, Sections 2 and 11, the Plaintiff has suffered, and continues to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment.

## VI. <u>REQUESTS FOR RELIEF</u>

WHEREFORE, the Plaintiff, Auctus Fund, LLC, respectfully request that this Honorable Court grant it the following relief:

A)      Order, grant and enter temporary, preliminary and permanent injunctive and equitable relief, and specific performance, and finding that the Plaintiff has suffered irreparable harm, has a likelihood of success on the merits, that the balance of hardships favors the Plaintiff and that it is in the public interest to grant such temporary, preliminary and permanent injunctive and equitable relief, and specific performance for the benefit of the Plaintiff, as set forth herein;

B)      Determine that the Defendants are liable for all damages, losses, and costs, as alleged herein;

C)      Determine and award the Plaintiff, Auctus Fund, LLC, the actual losses sustained by it as a result of the violations of law by the Defendants, as set forth herein;

D)      Render a judgment and decision on behalf of the Plaintiff, Auctus Fund, LLC, on all Counts of the Complaint, and issue findings of fact and rulings of law, as necessary and appropriate, that the Defendants are liable, in all respects;

E)      Order, decide, adjudge, and determine that the liability of the Defendants, is for all losses, injuries, and damages, special, consequential, general, punitive, and/or otherwise, and for all interest and costs, as alleged herein;

F)      Award the Plaintiff, Auctus Fund, LLC, its costs, including, but not limited to, filing fees, costs, expenses and interest, for being required to prosecute this action;

G)      Award the Plaintiff, Auctus Fund, LLC, its actual attorneys' fees, for being required to prosecute this action;

H)      Award the Plaintiff, Auctus Fund, LLC, multiple, double, treble, and/or punitive

damages in an amount to be determined;

I)      Enter judgment on behalf of the Plaintiff, Auctus Fund, LLC, on the Complaint;

J)      Order declaratory relief, as appropriate and as this Honorable Court deems

necessary; and/or

K)      Any additional relief, which this Honorable Court deems just and proper.


**THE PLAINTIFF, AUCTUS FUND, LLC,**
**DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE**


Respectfully Submitted,
PLAINTIFF, Auctus Fund LLC,

By its Attorneys,


_/s/  *Philip M. Giordano*_
Philip M. Giordano, Esq. (BBO No. 193530)
Sophia E. Kyziridis, Esq. (BBO No. 703590)
Giordano & Company, P.C.
REED & GIORDANO, P.A.
47 Winter Street, Suite 800
Boston, Massachusetts 02108-4774
Telephone: (617) 723-7755
Facsimile: (617) 723-7756
Email: pgiordano@reedgiordano.com
Email: skyziridis@reedgiordano.com

Dated: May 23, 2020